**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------X

**LGN INTERNATIONAL, LLC,and,**
**PRUDENT INVESTIMENTOS LTDA,**

                        plaintiffs,

  -against-

**HYLAN ASSET MANAGEMENT,**
**LLC, ANDREW SHAEVEL,**
**BAHAMAS MARKETING GROUP,**
**JOEL TUCKER,**
**SQ CAPITAL, LLC,**
**JT HOLDINGS, INC.,**
**HPD LLC,**
**HIRSCH MOHINDRA,**
**MAINBROOK ASSET PARTNERS I, LLC.**
**WORLDWISE PROCESSING GROUP LLC**
**FRANK A. UNGARO**
**BOBALAW VENTURES**

                    Defendants,

-------------------------------------------------------X

Docket No.
1:20-CV-03185

### SECOND AMENDED COMPLAINT
#### (Trial by Jury Demanded)

LGN International, LCC, ("LGN"), Prudent Investimentos LTDA ("Prudent) by and through its

attorneys, Dahiya Law Offices, LLC, for its Amended Complaint against Defendants Hylan Asset

Management, LLC, Andrew Shaevel, Bahamas Marketing Group, Joel  Tucker, SQ Capital, LLC,

JT Holding, Inc, HPD LLC, Hirsch Mohindra ,  Mainbrook Asset Partners I, LLC.  Worldwide

Processing Group, LLC and Frank A. Ungaro, Jr. and Bobalaw Ventures  states as follows:

### PREDICATE

1.      This Second Amended Complaint alleges, *inter alia*, violations under The Organized Crime

Control Act of 1970, Pub. L. No. 91-452, Section 901(a), 84 Stat. 941, Racketeer Influenced and

Corrupt Organizations ("RICO") and is brought by the LGN and Prudent in connection with a scheme

devised, conducted, and/or participated in by Defendants, each of whom was employed by or associated with each other (Association in Fact Enterprise) to conduct or participate, directly or indirectly, in the conduct of the affairs of Association in Fact Enterprise through a pattern of racketeering activity, and to conspire to do so, and to wrongfully and unlawfully take purchase price of phantom debts, and to conspire to do so, all to the detriment of the LGN and Prudent and others.

2.   This Amended Complaint also alleges (i) fraud by Defendant Mainbrook and other colluding defendants, (ii) conspiracy to defraud (iii) claim(s) for money fraudulently received by the defendants; (iv) claims for unjust enrichment against Shaevel and Mohindra and their companies.

3.   The relief sought includes actual damages, punitive damages and treble damages arising from the scheme to defraud set forth herein, the imposition of constructive trusts with tracing, the imposition and execution of equitable liens, an accounting, costs of investigation and suit, moratory interest and attorney's fees.

## JURISDICTION

4.   This Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under § 1961−68 (Racketeer Influenced and Corrupt Organizations Act ("RICO")). This Court has supplemental jurisdiction over LGN and Prudent's state law claims for relief pursuant to 28 U.S.C. § 1367, as those claims are substantially related to the federal RICO claims and arise from a common nucleus of operative facts, and thus they form part of the same case or controversy under Article III of the United States Constitution.

## PERSONAL JURISDICTION AND VENUE

5.   Venue is also proper for the claims arising under RICO pursuant to 18 U.S.C. § 1965(a) because a substantial part of the events giving rise to the claims occurred in New York, New York and 28 U.S.C. § 1391(b) and (g) since the Defendants are residents of, have an agent or agents, or transact their affairs in this District of New York, and the acts and occurrences in

furtherance of the claims alleged herein arose in this District,  and because the ends of justice require that other parties residing in other districts be brought before the court.  Plaintiff LGN maintained their place of business at 152 West 57 Street, New York, NY at the time of occurrence of the events giving rise to these claims.

## RELEVANT TIMES

6.     The relevant times to this Amended Complaint are from on or about 2013  through November 2015 & 2016 (When the defendants fraudulent induced the Plaintiffs to buy phantom debts)  and through December 2018, when the Federal Trade Commission and the New York Attorney General sought permanent injunction against these defendant wrong doers and prior to that  in 2016,  when the FTC sued Mohindra for selling counterfeit debt portfolios and through and continuing to the filing of this Amended Complaint and until late 2019 when the Defendants attempted to eliminate evidence of their wrong doings ("relevant times").

## PARTIES/PARTICIPANTS
### (Defendants)

7.     **Hylan Asset Management, LLC ("Hylan")** is a New York corporation, formerly known as Solex Asset Group, LLC, with its registered address and principal place of business at 5477 Main Street, Amherst, New York, 14221. Hylan transacts or has transacted business in this district and throughout the United States.

8.     **Andrew Shaevel ("Shaevel")** is, upon information and belief, a resident of the State of New York with an address of 5477 Main Street, Amherst, New York, 14221. Upon information and belief, Shaevel has been an owner, officer, director, member, and/or manager of Hylan. At times material to this complaint, acting alone or in concert with others, Shaevel has formulated, directed, controlled, had the authority to control, or participated in Hylan's acts and practices, including the acts and practices set forth in this complaint. Upon information and belief, among other things, Shaevel has controlled Hylan's finances and business operations, purchased debt through it and affiliated entities,

and signed corporate papers.  Shaevel resident of New York state  and, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

9.  **Bahamas Marketing Group, LLC ("BMG")** is, upon information and belief, a corporation organized in Kansas with an address of 14400 College Blvd., Lenexa, Kansas 66215.

10.  **Joel Jerome Tucker ("Tucker")** is, upon information and belief, a resident of Kansas with an address of 6299 Nall Avenue, Suite 100, Mission, Kansas 66202. Upon information and belief, Tucker has been an owner, officer, director, member, and/or manager of defendant BMG. At times material to this complaint, acting alone or in concert with others, Tucker has formulated, directed, controlled, had the authority to control, or participated in acts and practices, including the acts and practices set forth in this complaint. Upon information and belief, among other things, Tucker has controlled BMG's finances and business operations, purchased debt through it and affiliated entities, and signed corporate papers. In connection with the matters alleged herein, Joel Jerome Tucker transacts or has transacted business in this district and throughout the United States

11.  Defendant **SQ Capital, LLC ("SQ Capital"),** is a limited liability company organized in Missouri that lists 6299 Nall Avenue, Suite 100, Mission, Kansas 66202, as its registered business address. SQ Capital  has transacted business in this district and throughout the United States.

12.  **JT Holdings, Inc. ("JT Holdings")** is, upon information and belief, a corporation organized in Kansas and its sole member is SQ Capital. Defendant JT Holdings has an address of 6299 Nall Avenue, Suite 100, Mission, Kansas 66202. Upon information and belief, before JT Holdings adopted its current name in 2010, it was named Bahamas Marking Group, Ltd., BMG.

13.    **HPD LLC ("HPD")** is, upon information and belief, a Wyoming limited liability company with an address of 2120 Carey Avenue, Cheyenne, Wyoming 82001. Defendants SQ Capital, JT Holdings, and HPD, upon information and belief, have operated as a common enterprise in unlawful acts and practices as alleged below and are and have all been operated and controlled by defendant Tucker.

14.    Defendant **Hirsh Mohindra (Mohindra)** is, upon information and belief, a resident of the State of Illinois with an address of 500 Quail Ridge Drive, Westmont, IL 60559.

15.    **Worldwide Processing Group, LLC**, also d/b/a Worldwide Processing, also d/b/a Forward Movement Recovery or FMR ("Worldwide Processing"), is a New York limited liability company that has held its principal place of business out as 5817 South Park Ave., Hamburg, NY 14075. Worldwide Processing transacts or has transacted business in this district and throughout the United States.

16.    **Frank A. Ungaro, Jr. (Ungaro)** is or has been the owner and an officer of Worldwide Processing. At times material to this complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of Worldwide Processing, including the acts and practices set forth in this Complaint. Among other things, Ungaro has controlled Worldwide Processing's finances and business operations, purchased debt through it, and signed corporate papers. Ungaro resides in this district and, in connection with the matters alleged herein, transacts or has transacted business in this district and throughout the United States.

17.    Defendants **Worldwide Processing and Frank A. Ungaro,** Jr. (collectively, the

5

"Worldwide Defendants") are third-party debt collectors that, in many instances, have purchased or received portfolios of allegedly past-due consumer debt and collected payments from consumers nationwide. The Worldwide Defendants have attempted to collect purported debts by contacting consumers using instrumentalities of interstate commerce, including telephone calls, electronic mail, and United States mail.

18.    **Mainbrook Asset Partners I, LLC** ("Mainbrook") is, upon information and belief, a Delaware limited liability company with an address at 3500 South Dupont Highway, Dover, DE 19901.

19.    **Hylan Debt Fund LLC** an  Hylan affiliate is a Delaware limited liability company created on or about May 30, 2013,  controlled by Andrew Shaevel (CEO/Manager) maintained principal address at 3500 S. Dupont HWY, Dover, DE 19901 with a mailing address at 5477 Main street, C/o Hylan Asset Management, Amherst, NY 14221 with an registered agent Corporate Creation Network, Inc. 11380 Property Farms Road  221E, Pal  Beach Gardens, FL 33410.  In furtherance of giving legitimate zeal to the fraudulent acts etc., Shaevel filed certificate of a registration with the Florida authorities to transact business in Florida state in or about October 14, 2014.  After having used Hylan Debt Fund LLC as an instrument for sale of phantom debt, upon information and belief, Shaevel  on or about October 2019 withdrew the certificate of authority from the Delaware state.   On or about May 26, 2016, Shaevel used Hylan Debt Fund LLC as an entity to structure sale of phantom debts agreement with  LGN.

19a.  **Bobalaw Ventures** is the venture capital arm of Bobalew, LLC (Bobalaw). Bobalaw  is a business arm of Shaevel using it to give veneer of legitimacy to his racketeering activities. It

maintains an officer at 5477 Main Street, Amherst, NY 14221 USA. Bobalaw was frequently used by Shaevel for unlawful activities including inducing the Plaintiffs to purchase phantom debts, the subject matter of this lawsuit.

**VICTIM PLAINTIFFS**

20.   **LGN International, LCC**, **("LGN")** is a Florida limited liability company with an address of 1111 Kane Concourse, Suite 518 Bay Harbor Island, FL 33154.

21.   **Prudent Investimentos LTDA** ("Prudent Investimentos") is a limited liability company established under the laws of Brazil with an address at 145 Avenida Fagundes, Filho, 15 Andar, Vila Monte Alegre, Sao Paulo, SP, CEP 04304-010, Brazil.

**UNLAWFUL RACKETEERING ACTS**

22.   During the relevant times, the Defendants and Participants conspired with one another to defraud LGN and Prudent Investimentos. As part of the scheme to defraud, the Defendants accomplished the same by marketing and executing the sale package of debts through emails, telephonic calls, using of interstate mails, claiming that the said debts were authentic  when in fact there was no such outstanding debts as marketed and sold. The Plaintiffs were fraudulently induced to part with a sum of more than $2.5m as a price of the said debt packages. The Defendants thus enriched themselves unlawfully.  The multifarious racketeering activities through which these broad objectives of the Defendants and Participant were carried out consisted of a complex pattern of individual transactions and groups of transactions.

23.   It was a part of the scheme to defraud that Participants and Defendants would and did agree and conspire together with the others to devise and participate in a plan of deceit and deception, whereby they would and did abuse their positions of trust and  business relations; they would and

did abuse trust  granted to them and breached their obligations to act honestly and faithfully; and they would and did use false and fraudulent pretenses, representations and promises calculated to deceive persons of ordinary prudence and due care and make material nondisclosures and concealment of fact and information important to the plaintiffs in deciding whether to buy the debt package, all so as to unlawfully, intentionally and willfully, and with intent to defraud, that is, knowingly and with specific intent to deceive in order to cause financial gain to themselves to the detriment of plaintiffs.

24     That scheme to defraud evolved over time as a pattern of racketeering activities that inflicted discrete harms on Plaintiffs and others. These discrete transactions and harms are listed in the undermentioned paragraphs. The victims of the unlawful patterns of racketeering activity suffered discrete losses as a result of these activities.  The unlawful acts of the Defendants were spread over the entire country and over a period of time since 2013 until the federal indictments of few of them and state government and FTC obtaining the restraining orders against them.

25.     In carrying out the scheme to defraud the Plaintiffs, Defendants and Participant engaged, *inter alia,* in conduct in violation of Federal laws, to wit: mail fraud in violation of 18 U.S.C. § 1341; wire fraud in violation of 18 U.S.C. § 1343; violations of the Currency and Foreign Transactions Reporting Act, 31 U.S.C. § 5313; interstate transportation of persons and of property obtained by fraud in violation of 18 U.S.C. § 2314 and the Hobbs Act, 18 U.S.C. § 1951 attempting to collect on fake debts with threats.   How the Defendants violated the foregoing which entailed manufacturing facts, figures and creations of entities on an ad hoc basis to hide their identities and the purposes behind these fraudulent activities. There were findings and reports by the government that the defendants also sometimes used violence and other unlawful means to receive payments from the debtors and sometimes from those who did not any owe any monies on the debts enforced against

8

them.  Thus, the defendants while dealing with other consumer debtors did violate the Hobbs Act, 18 U.S.C. § 1951.

## The Debt Packing and Sale Scheme

26.     The corrupt agreement between the Defendants started taking shapes during and even before 2014, when the defendants decided to become rich.   And for the same the defendants planned, created and sold "phantom debts" as debt packages.  The "phantom debt" consisted of two types of purported debts that consumers did not owe. The first type of "phantom debt" consisted of counterfeit debts fabricated from misappropriated information about consumers' identities and finances. The second type of "phantom debt" consisted of allegedly bogus "autofunded" payday loans that the fraudulent association-in-fact enterprise of the Defendants foisted on consumers without their permission. Payday lenders affiliated with Tucker frequently issued loans without the purported borrowers' consent or even knowledge, to which they referred as "autofunded."

27.     Defendants, collectively, have distributed and profited these "phantom debts" despite receiving ample notice that the consumers did not actually owe them.

### A.  The Hylan Defendants' Distribution of Phantom Debts

28.     Since at least 2014, the Hylan Defendants have distributed phantom debt portfolios to unwary purchasers besides continuing to do their own collections on the debts employing their own entities. To obtain the debts, Defendant Shaevel partnered with two known peddlers of phantom debt, Hirsh Mohindra and Joel Tucker. Shaevel knew the portfolios contained phantom debts, but not only did he continue placing them for collection, he eventually created a shell company with Mohindra to hide his involvement. The Hylan Defendants also worked directly with the Worldwide Defendants to collect and profit from the said fake debts.

*1. Shavel Founds and Operates Hylan to Distribute Payday Debt Portfolios.*

29.     Defendant Hylan Asset Management was founded in 2010. Hylan is a debt broker that traffics in consumer debts, including a significant number of debts purportedly originating from online payday lenders. Hylan "placed" these debts for contingency collection on its behalf or it sold them outright. Hylan provided third parties with spreadsheets containing information about consumers and the alleged debts to the collector for a specified period of time. The agency then contacts consumers in the spreadsheet to coerce payment. The agency retains a percentage of what it collects while periodically remitting balances to Hylan.

30.     Hylan has farmed debts out to several collectors that have been the subject of numerous consumer complaints for phantom debt collection, including the collection companies that Hylan worked closely with.  And these companies used unlawful means to collect on these phantom debts. Hylan would sometimes package the sale of the debts with participation agreements wherein the debts are sold for a sum money, yet the seller, Hyland its members would retain interest (some percentage) from the collection used by the buyers of these debts  and or also collect using their own intermediaries to collect on the debts.

*2. The Hylan Defendants Obtain Phantom Debts from Known Fake Debt*
*Peddlers Joel Tucker and Hirsh Mohindra.*

31.     Starting no later than early 2014, the Hylan Defendants entered into a business relationship with Tucker and Mohindra to obtain and distribute phantom debt portfolios. Hylan around March 2014 used phone calls and emails to solicit and sell such portfolios which regarding portfolios owned by Hylan that originated from Mohindra despite full knowledge that collection agencies were stating that consumers do not recognize the names of the purported lenders.

32.     The phantom debts at issue in this case originated with **Joel Tucker**. Tucker is a disgraced former operator of a payday lending operation. He used his position in the payday lending industry

to acquire sensitive financial information of consumers, some of whom had payday loans and some of whom did not. *see also FTC v. Tucker*, 2:16-CV-02816 (D. Kan. 2017) ECF No. 69 ¶ 9. He then packaged that information as "debts" for sale to third-party debt collectors, even though many of those debts were not legitimately owed. *Id. R*ecently, the FTC obtained a $4.2 million judgment against him for distributing fake debts. Tucker sold at least $3 billion worth of fake debts to Hirsh Mohindra, who operated several businesses that distributed and collected on phantom debts, until the FTC and the State of Illinois sued and obtained a ban against him in 2016. *see also FTC v. Stark Law, LLC*, No. 1:16-cv-3463 (N.D. Ill. Mar. 21, 2016), ECF No. 1. As explained below, until March 2016, Mohindra supplied the Hylan defendants with billions in Tucker debt.

33.     Tucker is a former operator of a fraudulent payday lending scheme and a phantom-debt seller.[1]  Payday lenders affiliated with Tucker frequently issued loans without the purported borrowers' consent or even knowledge, to which they referred as "autofunded." In September 2014, the FTC and CFPB sued several of these lenders in actions known as *CWB* and *Hydra*.[2]  Through his relationship with these and other payday lenders, Tucker had access to extremely sensitive consumer information, like bank account numbers, places of employment, and social security numbers. He used that information to create bogus portfolios of "debts" supposedly owed on autofunded loans or debts that he simply counterfeited out of whole cloth. Tucker generally promoted these "debts" under the umbrella name "Bahamas Marketing Group" or "BMG," and sold many of them to former debt broker and collector Hirsh Mohindra, who in turn sold them to the Hylan Defendants.  There was actually no sale, rather a mutual understanding between these Defendants, who have had structured the alleged sale to disguise the real nature of their collusion.  On papers,

---

[1] *See FTC v. Tucker*, 2:16-CV-02816 (D. Kan. 2017), ECF No 69.
[2] *See FTC v. CWB Servs.*, No. 14-00783-CV-W-DW; *CFPB v. Moseley, Sr., et al.*, 4:14-cv00789-DW (W.D. Mo. Sept. 8, 2014).

Tucker sold billions' worth of debt to Mohindra, who then, through his company, Ashton Asset Management, LLC, sold it to the Hylan Defendants.

34.   Upon information and belief, Tucker operated this autofunded business, sale of phantom debts employing different entities including SQ Capital, JT Holdings and HPD LLC, which he controlled (collectively "Tucker"). Using the personal identity information obtained from debt portfolios, defendants Tucker, BMG, SQ Capital, JT Holdings, and HPD marketed, distributed, and sold counterfeit debt portfolios that purport to identify consumers who have defaulted on payday loans. On or about December 16, 2016, the United States Federal Trade Commission ("FTC") commenced an action against defendants Tucker, SQ Capital, JT Holdings, and HPD for selling "phantom debt." *See FTC v. Tucker et al., No. 2:16-cv-02816* (D. Kan. filed Dec. 16, 2016) (hereafter the "Kansas FTC Action").  On September 20, 2017, the Court in the Kansas FTC Action found that defendants Tucker, SQ Capital, JT Holdings, and HPD had, "marketed, distributed and sold counterfeit debt portfolios that purported to represent loans made by a variety of purported originators," in contravention of Section 5 of the FTC Act. *FTC v. Tucker*, No. 2:16-cv-02816 (D. Kan. Sept. 20, 2017), ECF No. 69 at *3.   Significantly, the Court in the Kansas FTC Action entered an order permanently restraining defendants Tucker, SQ Capital, JT Holdings, and HPD from, among other things, "misrepresenting or assisting others in misrepresenting, expressly or by implication the identity, originator, title, ownership, validity or enforceability of a debt." Id. Tucker companies then branched its operation using its henchmen including the other impleaded defendants. Once the complained fraud phantom sale had occurred the resulting profits derived (loot) was divided between the defendants—this way they thrived and continued to operate the Association in Fact criminal enterprise (Enterprise)

35.     Shaevel and Mohindra were a partner in an entity created or owned by Tucker.  All them knew the nature of the bogus debt and victimization of the targets which were  the consumers besides those collection or bonafide business collection companies that relied on their representations.

36.     Faced with a continuous litany of credible, well-documented consumer complaints, facially deceptive actions by their associates, and other evidence demonstrating the debts were autofunded or outright counterfeit, the Hylan Defendants continued to sell the debts and place them for collection. And when confronted with an accusation that he was distributing phantom debts, Shaevel created shell corporations to hide his involvement.

37.     Pattern of corrupt understanding and acts was very clear from  2014. Upon information and belief in July 2014, Mohindra contacted Shaevel and Shaevel's associate, Jon Purizhansky[3], about a portfolio of Tucker debts supposedly owed to online payday lender "500fastcash." Mohindra proposed that Shaevel market the portfolio, and later sent the file to Hylan. Upon information and belief the said portfolio was a counterfeit; 500FastCash never sold its loans to a third party for collection. Rather in  August, 2014, 500FastCash's general counsel, Jared Marsh, learned about the counterfeit 500FastCash portfolio, and tried to stop brokers—including Hylan—from distributing it. Upon  information and belief on August 21, he warned Purizhansky on the phone, and reiterated in an email that Shaevel received, that "500FastCash has not sold and is not selling its charged off debts for collection by any third-parties."

38.     Rather than identify Mohindra as the source of the portfolios, Shaevel and his associate misled Marsh in an attempt to keep the 500FastCash portfolio viable for sale. In response to Marsh, neither Shaevel nor Purizhansky identified Mohindra. Instead, Purizhansky dissembled that

---

[3] Purizhansky has been involved in many, if not all, of the phantom debt transactions between Hylan and Ashton. He played a major role in acting upon the purchases and sales of Tucker debt and advising Shaevel on how to proceed. Purizhansky is a convicted felon. In 2006, he pled guilty before district of court of the Western District,  for conspiracy to obtain a visa through a false statement.

Mohindra's company, Ashton Asset, had "returned" the file to Tucker and that "Ashton" "was not interested in being part of this mess."   Three weeks later, Mohindra, through a different shell company, sold the 500FastCash portfolio to another party Kelly Brace, who collected for Hylan.

39.    None of this affected Shaevel's relationship with Mohindra, for there was a clear understanding between them to make as much money as possible in shortest possible time. Particularly shortly after foregoing incident, the Hylan Defendants began purchasing large amounts of BMG debt from Mohindra.

*3. The Court-appointed receiver in CWB demands that Hylan stop collecting on fake debts.*

40.    The Hylan Defendants' continued distribution of fake debt eventually came to the attention of a receiver appointed by the *CWB* court to take over the fraud-riddled "lenders".  Upon information and belief, in June 2015, the receiver obtained a complaint about collection on an autofunded loan. The receiver's counsel, Brian Holland, contacted the collector, which called itself "NE Processing" or "NE Processors."   Mr. Holland eventually spoke with the collector's "floor manager," who admitted that "everyone in the debt-collection industry knew something was wrong with 'BMG'" but thought they could collect because "Hylan Financial had resumed selling BMG debt." Mr. Holland tried to cut off the BMG collection at its source, but ran into a wall of obfuscation from Hylan. Holland first sent a letter demanding that Hylan stop distributing *CWB* "debts" and provide information about how it obtained those debts. Rather than promising to stop distributing CWB debts, upon information and belief,  Hyman challenged the receiver's authority to even make that demand(claiming a "lack of authority for the Receiver's directive"). Hylan even refused to provide basic information about the portfolios, vaguely asserting that responding would be "unduly burdensome and that "confidentiality agreements" barred it from providing information about obviously fraudulent activity.   After the receiver responded by reiterating his demand for information, Hylan's counsel replied with another nonresponsive letter. Again, Hylan said nothing

about its phantom debt distribution, made no promise to avoid doing so in the future, and threatened to "vigorously oppose" any effort to compel it to provide information about the portfolios.

*4. Shaevel schemes with Mohindra to launder phantom debt.*

41.     While Hylan was dissembling to the CWB receiver, Shaevel and Mohindra were forming a new venture to keep selling BMG debt while hiding their involvement. On July 10, 2015, the day after Hylan sent its response to the CWB receiver, Shaevel formed Mainbrook Capital, LLC as a joint venture between Hylan and Ashton. Mainbrook Capital, in turn, formed two wholly owned subsidiaries: "Mainbrook Asset Partners, LLC" and "Mainbrook Asset Partners I, LLC., (collectively "Mainbrook").  Despite the convoluted structure, Shaevel and Mohindra ultimately controlled these entities. Shaevel was the CEO of Mainbrook Capital, the sole officer of Mainbrook Asset Partners, and a Managing Partner of Mainbrook Asset Partners I. Shaevel and Mohindra had a mutual understand  and plan and thus determined which portfolios the Mainbrook enterprise bought and sold.

42.     Shortly after forming Mainbrook, upon information and belief, the Hylan Defendants transferred the BMG portfolios to it. For example, on a single day – September 14, 2015 – Shaevel and Hylan transferred over a $800 million in BMG debt to Mainbrook Asset Partners. Shaevel and Mohindra soon began shopping the BMG portfolios to third parties. As part of those efforts, Shaevel distributed a PowerPoint document to potential buyers titled "Opportunity Overview: BMG Warehouse Debt" that promoted an "opportunity" to "acquir[e], manag[e], and liquidat[e]" over three billion dollars in Tucker debt.. Notably, the PowerPoint said nothing about the *Hydra* and *CWB* cases or gave any other indication that the portfolios may have contained phantom debt. Indeed, it did not even mention the lenders' names, for a disclosure  would have disclosed their fraudulent scheme.

*5. Shaevel and Mohindra Scheme of Sale to Prudent Investimentos
(Prudent Sale)*

43.     On or about from end of 2015, Shaevel in collusion with Mohindra made their move to sell the  Prudent a $200 million "BMG Warehouse Debt."  Shaevel prepared the sale  Agreement and emailed the same to Mr. Gitman, the owner of Prudent for executing the paperwork. Shaevel and Mr. Gitman exchanged emails.  On or arbout February 24, 2016, Shaevel wrote an email to Mr. Gitman and Mohindra, forwarding the proposed changes to the Prudent Sale Agreement,

> Great to connect with you today.  As we discussed I modified the prior November 27th agreement to contemplate the three tranches.  Exhibit A now shows the aggregate value of all transactions, as well as the details of the 3 separate transactions.  For our accounting and tax purposes, we need to show these as three separate transactions as contemplated in this agreement.  For your accounting and tax purposes, the agreement now clearly shows the average purchase rate for all transactions in aggregate.  In addition, we will issue separate bills of sale for each transaction.
>
>  I have provided the source agreement (from December 30th) and updated version (dated February 24th) and a compare in pdf to show what has changed.  Please review and let us know if this accomplishes your objectives.  It works for us.

Shaevel email to Mr. Gitman, Mohindra, Rayan Zawistowski,(Hylan).  In the revised Prudent Sale Agreement, Shaevel and Mohindra declared that Mainbrook Asset Partner LLC  " is the owner of certain Financial Accounts with an aggregate Outstanding Balance approximately equal to $166,666,667.00.    Trusting that the "Financial Accounts" were genuine accounts and collectible, Prudent bought the said accounts from Shaevel and Mohindra for a sum of $2 million dollars.[4] **Ex. A.** However, the parties also agreed that Shaevel and Mohindra would continue to collect on the debt as before, this time taking a percentage of collections and remitting the remainder to Prudent. Indeed, Shaevel acknowledged to Prudent that, even after the sale, "our affiliates are servicing the paper so in effect we have control of the debt and the cash."   Shaevel and Mohindra knew that the said debts were fake and in fact no such debt existed in the market. Gitman did not know that he was taken for

---

[4] The final deal transferred $167 million in BMG debt to Prudent. The parties had previously executed an agreement that gave Prudent the rights to the proceeds of Ashton's collection on $33 million in BMG debt.

a ride and that structured sale was just a ploy to get money from him.  Gitman wired the money to the Bank of America, located at 100 West 33rd Street, New York NY 10001, account maintained by Mainbrook Asset Partner I, LLC.   But that debt sold to Prudent was a "phantom debt" and thus not collectible.

44.     Defendant Shaevel had begun working with Prudent in December 2015.  Until March 2016, when the FTC sued Mohindra, Shaevel and Mohindra coordinated collection on Prudent's behalf, using the same phantom debt collectors they had always used, including the Worldwide Defendants. Worldwide operating under Ungaro was an instrument collecting for and on behalf of the Shaevel and his companies Hylan which in turn were the participating parties to the agreements of the debts sold to the buyers.

    *6. Worldwide a Monster Collection Arm of the Defendants Shaevel, Mohindra and Tucker*

45.  Upon information and belief, in many instances, Hylan placed debts that were counterfeit or from unauthorized loans for collection with the Worldwide Defendants.

46.     The Worldwide Defendants, upon information and belief, have operated as a debt collection enterprise since at least 2011. Worldwide is a New York limited liability company that collects primarily or exclusively on debts owed to third parties. Worldwide has collected most frequently under the trade names "Forward Movement Recovery" or "FMR." Worldwide collects on phantom debts, and has regularly transferred funds to Hylan. Worldwide Processing's misconduct has been profitable. Between January 2014 and January 2018, Worldwide Processing had deposits of $10,615,194.54 in its main bank account. Correspondingly, between April 28, 2016 and September 29, 2017, it transferred $298,335.44 to Hylan in apparent remittances. Frank A. Ungaro, Jr. (Ungaro) is the managing member and owner of Worldwide Processing. In that capacity, he knew that consumers were denying that they owed the phantom debts on which his business collected. He has signed agreements on Worldwide's behalf to collect on phantom debt portfolios. He has

also personally arranged for critical third-party services, including merchant accounts to accept consumer payments, telecommunication services that include the use of dozens of phone numbers to allow his collectors to obscure their identities, and skip-tracing software used to locate consumers. He is also a signatory on Worldwide Processing's bank accounts.

47. The Worldwide Defendants, upon information and belief, call consumers and demand payment for purported debts arising from payday loans purportedly taken out several years ago. But many of these debts, upon information and belief, simply do not exist or are not owed by the consumers whom these Defendants contact.

48.  Upon information and belief, as part of their attempt to deceive and intimidate consumers into paying these debts, the Worldwide Defendants have often refused to provide consumers with critical information about the debts. And they fail to send statutorily required validation notices that would also provide consumers with information about how to dispute the debts – something critically important here, where the consumers do not actually owe the debts. In addition, these Defendants, upon information and belief, have threatened to harass consumers' friends and family members. To coerce payments from consumers on debts that the consumers do not owe, the Worldwide Defendants have employed a variety of egregious debt collection practices, including threatening to harass consumers' friends, family members, and coworkers, and in a disturbing numbers of cases, making good on those threats. Sometimes Worldwide threatened people to collect on the debts including threats of arrests.

49.  Many of the consumers that the Worldwide Defendants contacted, upon information and belief, have never taken out a payday loan, do not owe any outstanding debts, or were the victims of an autofunded loan scam.

50.  Further, upon information and belief, in numerous instances, consumers have asked for additional information or have explained to the Worldwide Defendants that they do not owe the

purported debts. The Worldwide Defendants often respond to these inquiries by reciting consumers' personal information—including addresses, social security numbers, employment history, and banking information—in an attempt to make the debt appear legitimate or represent that they can collect on the debt regardless of its validity.

51.     Upon information and belief, the Worldwide Defendants continued to collect on the debts even after consumers told them that they had never heard of the lenders, did not owe debts, and in some cases, provided bank statements and other records to prove it. Upon information and belief, even after acknowledging receipt of numerous consumer complaints, the Worldwide Defendants continued to collect on the fake and autofunded debts and failed to make any meaningful attempt to verify the authenticity of the debts.

52.     Upon information and belief, these various communications between the Worldwide Defendants and consumers were by means of the interstate wires and mail.

53.   On June 26, 2018, the FTC and the Attorney General of the State of New York commenced an action against Hylan, the Worldwide Defendants, and Shaevel, among others, entitled *Federal Trade Commission, et. al. v. Hylan Asset Management, LLC, et. al.,* 18 cv 00710 (W.D. New York)( "FTC New York Action") in which it was alleged that the defendants have manufactured, marketed and collected on "phantom debt."

54.   On June 26, 2019, the Court in the FTC New York Action entered a stipulated order against Hylan, the Worldwide Defendants, Shaevel, among others, permanently restraining and enjoining them from, among other things, "participating in Debt Collection Activities" and from advertising, marketing, promoting, offering for sale, selling, distributing, buying, or processing payments on any Debt or any information regarding a consumer relating to a Debt."

7.   *Shaevel  and other Defendants Sells the  Portfolio Series-10 package to Defendant*
*(LGN sale)*

55.    On or around March 25, 2016 by an email, Shaevel through his newly formed Mainbrook

solicited to sell further the phantom debts by misleading people and other investors.   Shaevel

contacted the plaintiffs' owner Jacob Gitman with an "**Opportunity Overview: BMG Warehouse**

**Debt**," with full knowledge that the debts are not real debts. Further, Shaevel by this time had already

been aware that bogusness of his business models had come to the light of the authorities**.   Ex. C.**

Shaevel claimed that his company

> Mainbrook Asset Partners I, LLC ("MAP I") is offering for sale a large
> pool of BMG Warehouse Charge-off Loans ("BMG Accounts") acquired
> by Ashton Asset Management, Inc. ("Ashton"), a member of MAP I, from
> Joel Tucker via Graywave Capital, LLC or JR Holdings, LLC (the "Tucker
> Entities") over the last 18 to 24 months. The remaining pool is estimated
> to be between $2.7 Billion and $3.3 Billion in face value and is a subset of
> the original approximately $6 Billion of BMG Accounts acquired by
> Ashton. The balance of the BMG Accounts have been sold or liquidated
> by MAP I or its affiliates, including Ashton and Hylan Debt Fund, LLC
> ("HDF"). The entire remaining pool is being offered for sale at 100 basis
> points ("Sale Rate").

Mainbrook marketing Letter. With this offer, Shaevel in order to further induce the plaintiff's owner

provided the offer of the sale and attached figures of the value of the underlying debts. However,

these debts did not exist in real life, were rather phantom debts, the aforesaid bogus "autofunded"

payday loans.   Shaevel sold this BMG Warehouse Debt as "an opportunity for many in distressed

debt market." **Ex. C**.  In his marketing letter Shaevel dwells on the moratorium placed on the payday

loans by the federal government and subsequent voidance of the prohibition resulting in "valuable

opportunity."  Id. Tucker and his client lenders' challenge became an opportunity for many in the

distressed debt market.

56.    On or about May 25, 2016, Shaevel through his shell company Hyland Debt Fund, LLC sold

the plaintiff LGN, a debt package labelled as "Portfolio Series -10" which

> May be comprised of retail credit card accounts, pay day loans, installment
> loans, title loans, student loans, automobile loans, home equity loans,

mortgages, or other accounts, payables or payment intangibles, including, without limitation, any retail credit card account or other account, payable or payment intangible with respect to which there is a fresh , primary, secondary, tertiary or warehouse charged-off consumer receivable (including a VISN MasterCard receivable, private label credit card receivable, consumer loan, line of credit or any other asset class) which are written off by a selling institution or other applicable party pursuant to their accounting practices and that are: (i) purchased by the Company within seventy-two (72) months from the date of charge-off, (ii) have average balances of less than $5,000 per account, (iii) are originated accounts within the United States, and (iv) that shall either (x) not have been collected upon by a third-party since being sold by the originator of the account or (y) have only been owned and collected upon by one owner prior to being acquired by the Company.

**Participation Agreement. Ex. B.** With this Participation Agreement Shaevel with the very active assistance of the other colluding Defendants sold phantom debts "Portfolio containing approximately $70,000,000.00 of delinquent and/or charged-off consumer loan accounts for a total purchase price of $550,000.00." Id.  Shaevel  and his agents or other Defendants principals knew that said sale was a fraud and that in fact there was no sale of any bonafide debts. Shaevel structured the sale to show legitimacy, as if he had acquired the debts from Ashton Asset Management, Inc. who allegedly sourced the Accounts from Graywave Capital, LLC and JR Holdings, LLC all affiliates of Tucker. Importantly, in the Participation Agreement Hyan and Shaevel made the following representation:

> Title. Company [Hylan] has good, marketable and valid title to, and is the owner of, the Portfolio, free and clear of all Liens. No effective financing statements or like instruments will be on file in any jurisdiction with respect to any of the Company's rights in the Portfolio.

However this statement it turned out was a but false one. Hylan and Shaevel knew that this representation was false and fraudulent because the $70,000,000.00 debt portfolio which they sold to LGN consisted of "phantom debt."In fact Shaevel and all these companies working together as a criminal enterprise sold these alleged fake payday loans as *bonafide* debts.  **Ex. B.**

57.     Both of aforesaid transaction, Prudent Investimentos and LGN Participation Agreement  were communicated  between Mr. Gitman  and the Defendants using U.S. and private mails, emails and telephonic talks. The Defendants namely Shaevel and Mohindra and Tucker knowingly caused the

use of interstate mail for the purpose of executing this scheme to defraud the plaintiffs. The mailings related to the two sales contained fraudulent misrepresentation.  The Plaintiffs were damaged in business through the patterns of acts indictable as mail and wire fraud.

58.     The Defendants through each other schemed (as stated above) to sell the fake debts using wires and mails in furtherance of the scheme.

59.     Upon information and belief, from December 2015 through March 2016, the FTC itself received 101 complaints alleging that Worldwide Processing was pressuring consumers to pay debts they did not owe. Further that 43 percent of the debts that Worldwide collected on Mainbrook's behalf appear to have been CWB debts, even though the CWB lenders' names do not appear in that portfolio.

8. *The FTC and Illinois Shut Down Mohindra for Phantom Debt Sales and Collection.*

60.     On March 21, 2016, Hirsh Mohindra's web of deceit finally caught up with him. In an eleven-count complaint filed in federal court in Illinois, the FTC and the State of Illinois charged Mohindra, his businesses, and two associates with violations of state and federal consumer protection laws stemming from their distribution of phantom debt portfolios and their use of abusive debt collection practices to coerce payments from consumers on those debts.[5]

61.     On October 27, 2017, the court entered stipulated judgments against all defendants.[6]  For his part in disseminating portfolios of fake and "autofunded" debts and subjecting consumers to abusive and harassing debt collection practices, Hirsh Mohindra was banned from the debt

---

[5] *See FTC v. Stark Law, LLC*, No. 1:16-cv-3463 (N.D. Ill Mar. 21, 2016), ECF No. 1, *available at* https://www.ftc.gov/system/files/documents/cases/160330starklawcmpt.pdf.
[6] *Id.,* ECF No. 354, *available at* https://www.ftc.gov/system/files/documents/cases/stark_doc354stipperminjhirshetal_redacted.pd f; *Id.*, ECF No. 355, *available at* https://www.ftc.gov/system/files/documents/cases/stark_doc355stipperminjgaurav_redacted.pdf; *Id.*, ECF No. 356, *available at* https://www.ftc.gov/system/files/documents/cases/stark_doc356stipperminjpreetesh_redacted.pd f.

collection industry and subject to a $47 million judgment.[7]

## Pattern of Racketeering Activity

62.    Between 2013 and the present, each of the said Defendants engaged in a pattern of racketeering activity, within the meaning of 18 U.S.C. § 1961(5), consisting of the predicate acts of racketeering within the meaning of 18 U.S.C. § 1961(1)(B) described in aforesaid paragraphs *supra*, additional predicate acts set forth below, and other predicate acts to be identified after further investigation and discovery herein.

63.    Defendants engaged in two or more predicate acts of racketeering, and each committed at least one such act of racketeering after the effective date of RICO. The Defendants played the same roles in the scheme and pattern of racketeering activity as set forth herein. The predicate acts of racketeering activity were related in that they were committed for the purpose of concealing or obfuscating the reality of the underlying sale of the debts, that the debts were phony debts and in fact were not collectible thus could not have been sold.   And the sale of the debts to the Plaintiffs fully aware that the debts in question were phony. Further structuring the debts as if they have been purchased from lawful sources to sell them with the veneer of legitimacy, when in fact that sellers were just co-conspiring defendants and were in fact using each other as interchangeable agents to market bogus debts.   Defendants used emails, phone calls etc. and mailed interstate paperwork for effectuating sale of the said debts fully knowing that these proposed agreements especially to LGN and Prudent were materially false and misleading. Through such patterns of racketeering activity, each of the Defendants conducted or participated, directly or indirectly, in the conduct of the affairs of the  Enterprise in violation of 18 U.S.C. § 1962(c).  Also, the Defednants use of Worlwide for effectuating recovery on the phantom debt also violated the Hobbs Act, 18 U.S.C. § 1951, when they

---

[7] *Id.*, ECF No. 354.

threatened consumers with arrest and contacted the relatives of the consumer to collect on the loans that they consumers never owed.

64.     The scheme or artifice to defraud Plaintiffs, LGN and Prudent  and others  is described in the foregoing paragraphs, *supra*. In addition to the predicate acts of mail and wire fraud set forth therein and in furtherance of the scheme or artifice to defraud the Plaintiffs, the Defendants transmitted, or caused to be transmitted, by means of wire communication in interstate or foreign commerce, writings, signs, signals, pictures, and sounds, in violation of 18 U.S.C. § 1343, and also caused matters and things to be placed in a post office or authorized depository or deposited or caused to be deposited matters or things to be sent or delivered by a private or commercial interstate carrier, in violation of 18 U.S.C. § § 1341 and 1343, including, but are not limited to, the following:

a.   Upon information and belief, each of the proposed agreement and final executed sales Agreement especially, the LGN Sale and Prudent Sale as set forth in the foregoing paragraphs *supra*, were transmitted by interstate wire, by United States mail, and/or by private interstate commercial carrier, as evidenced by the fact that each such declaration or documents were signed in a State different from that in which the document was prepared or executed filed;

b.   Upon information and belief, each of the agreements executed with the Plaintiffs  as described above paragraphs *supra*, were transmitted by interstate wire, by United States mail, and/or by private interstate commercial carrier, given the likelihood that they were prepared, reviewed, or edited by employees of the Defendants their respective legal counsel, and likely other firms or individuals located in States other than that in which the document ultimately were finally executed.

c.   Emailing of the preliminary draft of the Agreement and soliciting new purchase or buyers for the fake debts as stated in Paragraph 42, supra.

**The RICO Enterprise**

65.      During the Relevant Time (said date being approximate and inclusive) and continuing to the present, Defendants collectively have constituted an enterprise within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c) or, alternatively, an association-in fact enterprise within the meaning of those provisions.

66.     The Enterprise is structured through the formal corporate ownership of the different entities of the Defendants and the relationships among Defendants.

67.     At all relevant times, each of the Defendants was, and is, a person that exists separate and distinct from the Enterprise.

68.     Beginning in 2014 Enterprise participated in the aforesaid complained of acts.

## COUNT I

## RICO (18 U.S.C. § 1962(C))
## (AGAINST ALL DEFENDANTS)

69.     The Plaintiffs here repeats the allegation of paragraphs 1-56 of the Amended Complaint.

70.     The Defendants, Hylan Asset Management, LLC, Andrew Shaevel, Bahamas Marketing Group, Joel Tucker, SQ Capital, LLC, JT Holding, Inc, HPD LLC, Hirsch Mohindra and Mainbrook Asset Partners I, LLC, Worldwide and Ungaro are each a "person" within the meaning of *18 U.S.C. §§ 1961(3)* and *1964(c)*.

71.     The Association in Fact Enterprise is structured through (1) the formal corporate ownership relationships among different defendants and the interrelated management structure resulting from the make-believe assignments of the debts from Joel Tucker to the Shaevel. Although the precise composition of the Enterprise changed over time with the inception and termination of particular legal proceedings against either of the defendants, but the formation and overall character and purpose of the Enterprise was consistent.

72.     At all relevant times, each of the Defendants was, and is, a person that exists separate and distinct from the Enterprise.

73.     The said Enterprise was engaged in, and its activities affected, interstate and foreign commerce as demonstrated in the foregoing paragraphs.

74.     Each of the Defendants engaged in a pattern of racketeering activity, within the meaning of 18 U.S.C. § 1961(5), consisting of the predicate acts of racketeering within the meaning of 18 U.S.C. § 1961(1)(B) described in the foregoing paragraphs and others to be identified after further investigation and discovery herein, *supra*. Each of the Defendants engaged in two or more predicate acts of racketeering, and each committed at least one such act of racketeering after the effective date of RICO.

75.     Through such patterns of racketeering activity, each of the Defendants conducted or participated, directly or indirectly, in the conduct of the affairs of the Enterprise in violation of 18 U.S.C. § 1962(c). Specifically, among other things, throughout the Relevant Period, in furtherance of and for the purpose of executing and attempting to execute the described schemes and artifices to defraud the Plaintiffs, and to manufacture, market, sell and collect "phantom debt", each of the Defendants, on numerous occasions, used and caused to be used wire communications in interstate and foreign commerce and U.S. mails, by both making and causing to be made wire communications and mailings.  These wire communications and mailings were made, inter alia, for the purpose of: (i) manufacturing "phantom debt"; (ii) marketing the "phantom debt" and selling the "phantom debt" portfolios to the Plaintiffs and others, and to engage in collection activities of the "phantom debt" as described herein; and (iii) communicating and coordinating with one another in the manufacturing, marketing, selling and collection of "phantom debt" through email, U.S. mail, and phone. The association-in-fact enterprise's conduct and acts in furtherance of the fraudulent scheme included, but were not limited to the predicate RICO acts of: (i) mail fraud in violation of 18 U.S.C. § 1341; (ii) wire fraud in violation of 18 U.S.C. § 1343, as set forth in 18 U.S.C. §§ 1961(1)(B) and (iii) extortion and other crimes in violation of 18 U.S.C. § 875-77, 880, and 18 U.S.C. § 1512, and which constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

76.     Defendants carried out their scheme in different states and could not have done so unless they

used the U.S. mails or private or commercial interstate carriers or interstate wires. The total number of phone calls, e-mails, and mailings is not yet known, but the use by the Defendants of the interstate wires and mails was widespread and pervasive in furtherance of their fraudulent scheme of manufacturing, marketing, selling and collecting "phantom debt."

77.  Each such use of a wire communication and/or mailing in connection with the described scheme constitutes a separate and distinct violation of the RICO statute, by virtue of violating the incorporated federal predicate acts proscribed by 18 U.S.C. §§ 1341 and/or 1343, and each causing direct injury to the Plaintiffs.

78.       Defendants committed acts constituting indictable offenses under 18 U.S.C. § 2314 in that having devised or intended to devise a scheme or artifice to defraud Plaintiffs or to obtain money from Plaintiffs by means of false or fraudulent pretenses, representations or promises, Defendants transported or caused to be transported in interstate or foreign commerce money having a value of $5000 or more [in fact $2.5m] which was stolen, converted or taken by fraud. Defendants also committed acts constituting indictable offenses under 18 U.S.C.§ 2315 in that they received money in excess of $5000, which crossed a State or United States boundary after being stolen, unlawfully converted or taken. The acts of Defendants set forth above were done willfully and with knowledge that the money was stolen, converted or taken by fraud. These acts were done intentionally and knowingly with the specific intent to advance Defendants' scheme or artifice.

79.     As a direct and proximate result of RICO violations of 18 U.S.C. § 1962(c) by the Defendants, the Plaintiffs have been injured in its business or property, suffering damages in an amount to be determined at trial. The damages to the Plaintiffs include, but are not limited to, monies paid as sale price of the fake debts and  other lost business opportunities; and attorneys' fees and

costs, including attorneys' fees and costs associated with exposing and pursuing redress for Defendants' criminal activities.

80.     Pursuant to the civil remedy provisions of 18 U.S.C. § 1964(c), the Plaintiffs are thereby entitled to recover treble damages, together with the costs of this suit and reasonable attorneys' fees.

**COUNT II**

**RICO (18 U.S.C. § 1962(b))**
**(AGAINST ALL DEFENDANTS)**

81.     Plaintiff incorporates by reference all the preceding paragraphs of this Complaint as if fully set forth herein.

82.     Defendants violated RICO and Plaintiff was injured as a result.

83.      Each Defendant is a "person" capable of holding legal or beneficial interest in property within the meaning of 18 U.S.C. § 1961 (3).

84.     Each Defendant violated 18 U.S.C. 3 1962(b) by the acts described in the prior paragraphs, and as further described below.

85.     The defendants collectively compose an Association in Fact Enterprise for the common and continuing purpose described herein and constitute an enterprise within the meaning of 18 U.S.C. 3 1961(4) and the defendants acquired or maintained, directly or indirectly an interest in or control of this Enterprise through pattern of racketeering activity, thus causing injury to the plaintiffs.  The members of the enterprise functioned as a continuing unit with an ascertainable structure separate and distinct from that of the conduct of the pattern of racketeering activity. There may also be other members of the enterprise who are unknown at this time.

86.     Alternatively, Shaevel or Mohindra or Tucker controlled companies each constitute an enterprise within the meaning of 18 U.S.C. 1961(4)

87.     Alternatively, the  Shaevel or Mohindra or Tucker controlled companies together constitute an enterprise within the meaning of 18 U.S.C. 3 1961(4).

88.     Each enterprise has engaged in, and their activities have affected, foreign commerce.

89.     The Defendants through a pattern of racketeering activity maintaining an interest and control of the Enterprise.

90.     Each defendant conducted their activities unlawfully using unlawful means to sell phantom debts misleading the buyers about their origin and value. Each defendants used mail and wire for the purposes of maintaining an interest in the enterprise so that the other defendant could have the support of the other for the purposes of reaping fraud benefits.  One [Tucker]will prepare the charts and spreadsheet with false claims and other [Shaevel] would solicit buyers for the phantom debts and third [Mohindra] will execute the Agreements. Sometimes their roles changed. The defendant parties will structure the sale of the debts in such a manner as if the Mohindra, Shaevel and Tucker were working at arm's length and that the business deals were genuine with bonafide sales. Each defendant will have to bring the loot to the Enterprise so that they could continue to maintain an interest. With each new victim, the Defendants business prospered.

91.     For maintaining business interest in the Enterprise, the defendants used mail and wire fraud. The defendants would use interstate mailing, emailing and use telephones to send false claim's sheet, false list of debtors and false debt holders. One could  not operate without the others assistance.   The named defendants, Mohindra, Shaevel and Tucker participated in the management of the enterprise. Plaintiffs specifically alleges that Defendants participated in the operation and management of the association-in-fact enterprise and the alternative enterprises by overseeing and coordinating the commission of multiple acts of racketeering as described above.

92.     Defendants committed acts constituting indictable offenses under 18 U.S.C. $$ 1341 and 1343 in that they devised or intended to devise a scheme or artifice to defraud the Plaintiffs and to

obtain money from Plaintiffs by means of false or fraudulent pretenses, representations or promises. For the purpose of executing their scheme or artifice, Defendants caused delivery of various documents and things by the US mails or by private or commercial interstate carriers and emails. Defendants also transmitted or caused to be transmitted by means of wire communications in interstate foreign commerce various writings, signs and signals. The acts of Defendants set forth above were done with knowledge that the use of the mails or wires would follow in the ordinary course of business. or that such use could have been foreseen, even if not actually intended. These acts were done intentionally and knowingly with the specific intent to advance Defendants' scheme or artifice.

93.    Defendants also caused Plaintiff to transmit more than $2.5 million of dollars in funds by wire to the Defendant Shaevel and Mohindra and or his companies for debts sold pursuant to direction and or in collusion with Tucker.

94.    Defendants' shared objective was and is to divert funds to their own benefit and to facilitate the operation and maintenance of Enterprise.

95.    The Plaintiffs reasonably and justifiably relied upon Defendants' false representations, false pretenses and deceptive communications, and Plaintiff has been damaged as a direct and proximate result of Defendants' participation in such enterprise, as alleged herein.

96.    Defendants committed acts constituting indictable offenses under 18 U.S.C. § 2314 in that having devised or intended to devise a scheme or artifice to defraud Plaintiffs or to obtain money from Plaintiffs by means of false or fraudulent pretenses, representations or promises, Defendants transported or caused to be transported in interstate or foreign commerce money having a value of $5000 or more, which was stolen, converted or taken by fraud. Defendants also committed acts constituting indictable offenses under 18 U.S.C.§ 2315 in that they received money in excess of $5000, which crossed a State or United States boundary after being stolen, unlawfully converted or

taken. The acts of Defendants set forth above were done willfully and with knowledge that the money was stolen, converted or taken by fraud. These acts were done intentionally and knowingly with the specific intent to advance Defendants' scheme or artifice.

97.     As a direct and proximate result of RICO violations of 18 U.S.C. § 1962(b) by the Defendants, the Plaintiffs have been injured in its business or property, suffering damages in an amount to be determined at trial. The damages to the Plaintiffs include, but are not limited to, monies paid as sale price of the fake debts and  other lost business opportunities; and attorneys' fees and costs, including attorneys' fees and costs associated with exposing and pursuing redress for Defendants' criminal activities.

98.     Pursuant to the civil remedy provisions of 18 U.S.C. § 1964(b), the Plaintiffs are thereby entitled to recover treble damages, together with the costs of this suit and reasonable attorneys' fees.

## COUNT III
### RICO (18 U.S.C. § 1962(d))
**(Against all Defendants)**

99.     Plaintiff incorporates by reference all the preceding paragraphs of this Complaint as if fully set forth herein.

100.     In violation of 18 U.S.C. § 1962(d), the Defendants and each of them, knowingly, willfully, and unlawfully conspired to facilitate scheme which included the operation or management of a RICO enterprise as well as maintaining interest in the RICO enterprise through a pattern of racketeering activities as alleged in the foregoing paragraphs

101.     The conspiracy commenced at least as early as 2014 and was ongoing until 2019. The conspiracy's purpose was to divert money from the Plaintiffs to their own benefit and to facilitate the payment to each partners involved in the loot and in an effort to defraud the Plaintiffs.  Each Defendant committed at least one overt act in furtherance of such conspiracy. These acts in

furtherance of the conspiracy included. misleading Plaintiffs as to the true nature of the business or the debts. And not disclosing that the debts were counterfeit ones.  The purpose of the conspiracy was steal money from the plaintiffs.  And they did manage to steal more than $2.5 million from the plaintiffs.

102.    The Plaintiffs have been injured and continues to be injured in its business and property by Defendants' conspiracy in violation of 18 U.S.C. $ 1962(d). The unlawful actions of Defendants, and each of them, have directly, illegally, and proximately caused and continue to cause injuries to Plaintiffs in its business or property. Plaintiff seeks an award of damages in compensation for. among other things, the millions of dollars that Defendants stole from Plaintiff. Plaintiff further seeks an award of three times the damages they sustained, and the recovery of reasonable attorneys' fees and costs of investigation and litigation, as well as any other relief as authorized.

### COUNT IV
### (Fraud Against all Defendants)

103.    The Plaintiffs incorporates by reference all the preceding paragraphs of this Complaint as if fully set forth herein.

104.    The Defendants, knowingly and intentionally misled Plaintiff by failing to disclose that the sold debts were counterfeits one.

105.    Defendants' failure to disclose the fakeness of the debts was material because Plaintiff relied upon the honest services or assurance of the Defendants in the conduct of its business.  The Plaintiffs relying upon the Defendants paid more than $2.5m for the purchase of the debt.

106.    Defendants conduct was willful, wanton, malicious, and oppressive.

107.    Defendants' unlawful conduct has directly, legally, and proximately caused and continues to cause injuries to Plaintiff in its business or property. This injury includes Plaintiff paying monies for the purchase of the debts when in fact there no debts to be sold. Accordingly, Plaintiff seeks an

award of damages in compensation for, among other things, the millions of dollars that Defendants stole from Plaintiffs. Further, Plaintiff seeks the imposition of punitive damages sufficient to deter Defendants from committing such unlawful conduct in the future.

### COUNT IV
### (Civil Conspiracy to Defraud)

108.   Plaintiffs incorporates by reference all the preceding paragraphs of this Complaint as if fully set forth herein.

109.   Defendants, and each of them, combined and agreed with each other and or others to defraud Plaintiffs by failing to disclose that the debt portfolio sold to the Plaintiffs was counterfeit and in fact there were no debts which were marketable. This conspiracy to sell counterfeit debts commenced at least as early as 2013.

110.   Each Defendant committed at least one overt act in furtherance of such conspiracy including misleading Plaintiff as to the true nature of the debt, making fake debt sheets, fake debtors and or owners of the loans and making agreements for sale and structuring the sale in a manner to conceal the real identity of the participants and or nature of the debts, participating in negotiations for a proposed sale to the Plaintiffs, and concealing the fakeness of the debts all as described above.

111.   Each Defendant acted with the common intent to defraud Plaintiffs and understood that all other Defendants shared in that common purpose.

112.   Defendants conduct was willful, wanton, malicious, and oppressive.

113.   Defendants' unlawful conspiracy has directly, legally, and proximately caused and continues to cause injuries to Plaintiff in its business and property. This injury includes Plaintiff paying for something that never existed and thus losing more than$2.5m.

114.   Plaintiffs seeks an award of damages for, among other things, the millions of dollars that

Defendants stole from Plaintiff, which occurred as a result of Defendants' conduct. Further, Plaintiff seeks the imposition of punitive damages sufficient to deter Defendants from committing such unlawful conduct in the future.

## **COUNT V**

### (Fraudulent Inducement Against Shaevel, Bobalaw, Tucker and Mohindra and their Companies)

115.    The Plaintiffs realleges and incorporates by reference all prior paragraphs if set forth fully herein.

116.    In order to induce Plaintiffs to enter into the Agreement and related documents including the Participation Agreement Defendants themselves and through their representatives made the following representations to the plaintiffs during a series of telephonic conferences beginning in the 2015 and continuing through closings of the two loans by the year 2016:

      a.   That the defendant's promised debts were authentic and the same were sold at a cheaper rate;

      b.   That the defendants and the plaintiffs both would make profits from the collection on the said debts; and

      c.   That the defendants are giving the plaintiff the debts that which are collectible.

117.    Relying on the said representation, the Plaintiff LGN entered into a participation agreement by which it agreed to purchase from the Defendant Hylan and Mohindra debt portfolio of 70,000,000.00 for the sum of $500,000.00.

118.    Relying the said represnation Prudent Investimentos entered into a Participation Agreement with Shaevel and his companies by which it agreed to purchase from Mainbrook debt portfolio of $200,000,000.00. for $2 million.

119. These representations of paragraph numbered 101 were a material part of the Agreement described herein.  When Shaevel and Mohindra and their agents made representations they knew them to be false and made these presentation with he intention to deceive and defraud plaintiffs and to induce them to actin reliance on these representations. In fact, Defendants did not have any debts, rather they were just numbers created on a spread sheet to fraudulently induce the plaintiffs to part with their money.

120.   The plaintiffs reasonably relied on Defendants representation, given that they held themselves out as experienced reputable consumer debt collectors.

121.   The misrepresentation were the proximate cause of the Plaintiffs having lose their funds. Had the defendants not made these misrepresentations plaintiff would have not proceeded with the said purchases. The above-described conduct has caused plaintiffs to suffer complete loss in an amount exceeding $2.5m.

122.   There aforesaid statements were intentional misrepresentation made with the intention on the part of Defendants to deprive plaintiff of their money.   In making these intentional misrepresentations, Defendants acted in a willful, wanton and malicious manner, in callous, conscious, and intentional disregard for the interest of plaintiffs, and with knowledge that their conduct would injure plaintiff.

123.  The Defendants sold LGN and Prudent "phantom debt," thus causing serious damages to the Plaintiffs.  As a result, plaintiffs are entitled to recover exemplary and punitive damages.

**COUNT VI**
**(Unjust Enrichment)**
**(Against SHAEVEL, BOBALAW, MOHINDRA AND THEIR COMPANIES)**

124.   The Plaintiffs realleges and incorporates herein by reference each and every foregoing paragraph of this Complaint as if set forth in full.

125.   The Plaintiffs under the impression that they were indeed getting a good business deal paid more than 2.5 million dollars for the purchase of the debts.  But the said defendants Mohindra and Shaevel sold the plaintiffs "phantom debts," which had no value in the market.

126.   The Defendants sought and obtained more than 2.5 million by virtue of fraudulent misrepresentation The Defendants have been unjustly enriched by said payments.

127.   As a direct and proximate result of the Defendants' wrongful conduct, all the said Defendants are liable to the Plaintiffs for the amount of the monetary benefits conferred upon the Defendants, including, without limitation, the profits, benefits and other financial benefits wrongfully obtained.

128.   The Defendants should be compelled to disgorge all unlawful, inequitable and unjust proceeds received and/or realized as a result of their wrongful conduct.

PRAYER FOR RELIEF

WHEREFORE, the plaintiffs PRAYS:

1.   That judgment be entered against all the Defendants, each of them jointly and severally:

A. In an undetermined amount not less than Three Million Dollars ($3,000,000.00) upon Count I for Relief, for violation of 18 U.S.C. § 1962(c), the sum duly trebled in accordance with 18 U.S.C. § 1964(c).

B. In an undetermined amount not less than Three Million Dollars ($3,000,000.00) upon Count II for Relief, for violation of 18 U.S.C. § 1962(b), the sum duly trebled in accordance with 18 U.S.C. § 1964(c).

C. In an undetermined amount not less than Three Million Dollars ($3,000,000.00) upon Count III Claim for Relief, for violation of 18 U.S.C. § 1962(d) by conspiracy to violate 18 U.S.C. § 1962(c). the sum duly trebled in accordance with 18 U.S.C. § 1964(c).

D. For the costs of suit including reasonable attorney's fees in accordance with 18 U.S.C. § 1964(c).

E.   Award Compensatory, consequential, exemplary and punitive damages to the Plaintiffs in an amount to be determined at trial for rest of the Counts.

F.      In addition, the Plaintiffs prays for equitable relief against Defendants in the form of such injunctive and related relief as might be appropriate in accordance with 18 U.S.C. § 1964(a) including:

(i) An equitable accounting for all benefits, consideration and profits received directly or indirectly or underlying, including but not limited to, the imposition of a constructive trust with tracing.

(ii) The imposition and execution of equitable liens.

(iii) Any restrictions which may be appropriate on future conduct or activities.

(vi) For such other damages, relief and pre- and post-judgment interest as the Court may deem just

Dated: New York,
New York January 19, 2021

Dahiya Law Offices, LLC

*/s/Karamvir Dahiya*
75 Maiden Lane Suite 506
New York NY 10038
Tel: 212 766 8000
Email: karam@dahiya.law