# Exhibit 1

ORIGINAL

IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | Case No.  18-00153-01-CR-W-RK |
| JOEL J. TUCKER, | |
| Defendant. | |

## PLEA AGREEMENT

Pursuant to Rule 11(c)(1)(B) of the Federal Rules of Criminal Procedure, the parties described below have entered into the following plea agreement:

1. **The Parties.**  The parties to this agreement are the United States Attorney's Office for the Western District of Missouri (otherwise referred to as "the Government" or "the United States"), represented by Timothy A. Garrison, United States Attorney, and Kathleen D. Mahoney, Assistant United States Attorney, and the defendant, Joel Tucker ("the defendant"), represented by J.R. Hobbs and Marilyn Keller.

The defendant understands and agrees that this plea agreement is only between him and the United States Attorney for the Western District of Missouri, and that it does not bind any other federal, state, or local prosecution authority or any other government agency, unless otherwise specified in this agreement.

2. **Defendant's Guilty Plea.**  The defendant agrees to and hereby does plead guilty to: Count One of the Superseding Indictment charging him with a violation of 18 U.S.C. § 2314, that is, Interstate Transportation of Stolen Money; Count Fourteen of the Superseding Indictment charging him with a violation of 18 U.S.C. § 157, that is, Bankruptcy Fraud; and Count Sixteen of

the Superseding Indictment charging him with a violation of 26 U.S.C. § 7201, that is, Tax Evasion. The defendant also agrees to forfeit to the United States $5,000, which he admits is proceeds traceable to the offense alleged in Count One. By entering into this plea agreement, the defendant admits that he knowingly committed these offenses, and is in fact guilty of these offenses.

  **3. Factual Basis for Guilty Plea.** The parties agree that the facts constituting the offenses to which he is pleading guilty are as follows:

  Defendant Joel Jerome Tucker was a resident of Johnson County, Kansas, and owned businesses in Missouri, Kansas, Colorado, and Wyoming.

  Beginning in at least 2002 and continuing through 2012, Joel Tucker, working through various companies, serviced payday loan businesses. Tucker's company names changed over the years; the primary company would become eData Solutions, LLC (eData). eData, formally registered on July 29, 2009, did not make loans directly to borrowers; it collected loan application information, referred to as leads, and sold those leads to its approximately 70 payday lender clients. As a loan servicer, eData also provided software for payday lenders.

  From 2014 to 2016, Joel Tucker, operating under multiple businesses and business bank accounts, engaged in two related schemes to defraud: a sale of fraudulent debt scheme and a bankruptcy fraud scheme. In the sale of fraudulent debt scheme, Tucker defrauded third party debt collectors and millions of individuals listed as debtors through the sale of falsified debt portfolios. These portfolios were false in that Tucker did not have chain of title to the debt, the loans were not necessarily true debts, and the dates, amounts, and lenders were inaccurate and in some cases fictional. In his bankruptcy fraud scheme, Tucker also sold fraudulent debt, which entered the United States Bankruptcy Courts nationwide, and then made false statements and presented false information to the Bankruptcy Court and violated court orders to conceal his sales of fake debt.

  Tucker used the companies Alloy Data Systems, Graywave Capital Management LLC (Graywave), HPD LLC, JT Holdings Inc., KSQ Management LLC (KSQ), and SQ Capital LLC to sell the debt. Tucker sometimes sold the debt through debt brokers or other intermediaries.

  On November 17, 2011, Tucker opened a business bank account in the name KSQ Management, LLC at Bank of the West, account number ending 2331. Tucker was identified as the president and was the sole authorized signer on the account.

  On February 5, 2016, SafeLock PC LLC, a company formed under Wyoming laws, was registered to do business in Missouri. Tucker identified himself as CEO of SafeLock, solicited investments on behalf of SafeLock, and signed a commercial lease for office space in Kansas City, Missouri, on behalf of SafeLock as a partner.

2

For tax years 2014 - 2016, neither Tucker personally nor any of his companies filed federal tax returns with the Internal Revenue Service, including:

    a.      Graywave Capital Management
    b.      HPD LLC
    c.      JT Holdings Inc.
    d.      KSQ Management LLC
    e.      SQ Capital LLC

## PURPOSE OF THE SCHEMES TO DEFRAUD

Between 2014 and continuing into 2016, Tucker executed a fraudulent debt scheme by marketing, distributing, and selling false debt portfolios that purported to represent valid due and owing payday loans made by a variety of purported lenders, including "500FastCash" and "Castle Peak." Tucker sold supposed debts which: 1) he didn't personally own; 2) were not true debts; 3) had already been sold to other buyers; and 4) contained false lenders, false loan dates, false loan amounts, and false payment status. Tucker received approximately $4 million to 7.3 million from the sale of false debt portfolios. The purpose of Tucker's scheme was to fraudulently obtain money for his own use and gain. As part of his fraud scheme, Tucker transferred the proceeds of the fraud scheme across state lines, as delineated below.

In 2015, Tucker executed a related bankruptcy fraud scheme in which he marketed, distributed, and sold false debt portfolios though a debt broker to bankruptcy debt collectors. Tucker sold supposed debts which: 1) he didn't own; 2) were not true debts; 3) had already been sold to other buyers; and 4) contained a false lender name, false loan dates, false loan amounts, and false payment status, for his financial use and gain. When the United States Bankruptcy Court investigated these purported debts which were presented as claims in bankruptcy cases, Tucker provided false information and testimony to the Bankruptcy Court in order to conceal his scheme.

## SALE OF FRAUDULENT DEBT SCHEME

On August 1, 2012, President Obama signed a law referred to as Operation Chokepoint, which resulted in banks refusing to make Automated Clearinghouse withdrawals from their customers' bank accounts associated with payday lenders, which greatly reduced the profitability of payday loans. Many payday lenders went out of business after Operation Chokepoint.

On June 20, 2012, Tucker and the other owners of eData sold the company to the Wyandotte Indian tribe. By the terms of the sale agreement, Tucker did not retain ownership or chain of title to any payday loans made by eData's clients.

However, despite selling his interest in eData, Tucker maintained a file of 7.8 million leads ('7.8 file') he had acquired through eData, containing detailed customer information including names, addresses, bank accounts, social security numbers, dates of birth, etc. Tucker's company eData collected the detailed customer information from online payday loan applications or inquiries to its payday lender clients. The 7.8 file did not represent loans, as loans would have been made by the various payday lenders. The 7.8 file contained listed customers, some of whom

3

withdrew their requests for loans, some of whom were denied loans, some of whom obtained loans and repaid them, and some of whom obtained loans and defaulted in the payments.

In addition, Tucker obtained and retained data regarding defaulted payday loans eData had acquired from a number of different payday lender clients.  The data for the defaulted payday loans were stored in "iCollect" files.  The iCollect files did not include the actual loan origination documents as those documents were retained by the payday lender clients.  Notwithstanding that Tucker did not have chain of title to these iCollect files, he proceeded to package, market, and sell this information as collectible debt to multiple debt buyers through 2014 and 2015.

Tucker, for the purpose of executing the scheme to defraud, often used intermediaries and debt brokers to recruit debt buyers by presenting to potential buyers that he owned the debt he was marketing, that it was legitimate debt and/or that it had not been sold to other debt buyers.  Tucker well knew that the representations to be made by the debt brokers and intermediaries were false at the time they were made.

On or about July 22, 2014, Tucker created a fraudulent contract between seller Black Creek LLC, supposedly representing 500FastCash, and buyer SQ Capital LLC, Tucker's company.  The contract purported to sell charged-off payday loan accounts from Black Creek LLC to SQ Capital LLC, with an unpaid balance due of $94,999,140, for $1,274,984.18.  Black Creek LLC did not own 500FastCash loans.  500FastCash and related payday lenders such as Ameriloan, AdvantageCashServices, AceCashServices, etc., were associated with Tucker's brother Scott Tucker and serviced by AMG Services, Inc.  Tucker created and used this fraudulent Black Creek LLC contract to make it appear as though he owned the payday loan debt.

Through SQ Capital and other companies, Tucker sold payday loan debt he did not own to multiple entities, including:  debt broker United Debt Holdings; STP Management Group; Delray Capital, LLC; Bayview Solutions, LLC; Solutions Software, CHM Capital Group LLC; Aura Development, Inc.; Ashton Asset Management; and others.

Tucker, either directly or through a debt broker, represented that he owned the debt.  Tucker sold the debt in the form of spreadsheets created from his 7.8 file and the iCollect files.  The spreadsheets, also called debt portfolios, contained customer names, dates of birth, addresses, phone numbers, bank accounts, email addresses, employers, and references.  Most of this information was accurate and allowed the debt purchasers to contact the customers and attempt to collect the debt.  Thus, Tucker placed in the hands of debt collectors the means through which they could mislead customers regarding their debt obligations.  Some customers actually paid the debt collectors out of fear or confusion about what they owed.

The spreadsheets Tucker sold to debt purchasers also contained loan information.  The loan information was often false, listing false lenders, false loan amounts, false past due amounts, and false loan dates.

Tucker sold the same sets of debts to multiple purchasers, materially failing to disclose to purchasers that he had previously sold the same debt.

Beginning in September 2014, AMG sent cease and desist letters to debt buyers such as Delaware Solutions and Clear Credit Solutions, who had bought fake debt from Tucker or his

4

intermediaries, and then attempted to collect from customers and non-customers alike, for purported payday loan debt serviced by AMG.  Notwithstanding the cease and desist letters, Tucker continued to sell payday loan debt he did not own through late 2014 and all of 2015.

On December 16, 2016, the Federal Trade Commission (FTC) filed a civil suit against Tucker and three of his companies, SQ Capital, LLC, JT Holdings, Inc., and HPD LLC, in the District of Kansas, case number 16-CV-02816, for misleading consumers through unfair collections practices, including the sale of false debt portfolios.  Tucker represented himself in this lawsuit, and on or about March 15, 2017, he emailed the FTC an accounting of his ownership of the payday loan debt, stating, "I do not have the chain of title in my possession.  The Wyandotte Indian Tribe has it held their records.  I do not have any rights to the chain of title for any transactions with SQ Capital, JT Holdings, or HPD."

## BANKRUPTCY FRAUD SCHEME

In 2015, Tucker sold false debt portfolios to First Source Data (FSD), owned by Jeffrey Brooks, a debt broker.  FSD brokered the debt to Porania LLC, a bankruptcy debt purchaser.  A bankruptcy debt purchaser specializes in buying debt in which the debtors have filed for bankruptcy.  The debt purchaser then files claims in Bankruptcy Chapter 7 and Chapter 13 cases throughout the country.  Through this business model, bankruptcy debt purchasers collect a portion of the debts when the bankruptcy trustees sell assets or collect payments from debtors.

Tucker caused to be created the debt portfolios he sold using his 7.8 file of payday loan leads and the iCollect files.  He did not have title to the debt he sold to FSD.  He provided two debt portfolios (spreadsheets), the first named "JB 11-18-2015_Revised1.xlsx" that listed 8,775 debtors who had filed for bankruptcy, including the district of their bankruptcy and the name of the bankruptcy trustee.  The second spreadsheet, named "FSD 12-10-2015.xls," listed 5,628 debtors who had filed for bankruptcy.  Approximately seventy of the listed debtors in the two spreadsheets were in bankruptcy in the Western District of Missouri.  The spreadsheets contained false information, including that the listed consumer had received a loan, was in default on the loan, and the dates of the loans.  Tucker caused to be listed the lender of all the debt he sold to FSD as "Castle Peak."  This was fictional; Castle Peak was not a payday lender or servicer.  Tucker caused to be listed the loan amount for each debtor as $300, and the financing charge as $90; he thus represented each debtor owed $390.  These amounts were also fictional.

Tucker sold the above-mentioned spreadsheets to FSD in two installments, the first for $30,000 on November 27, 2015, the second for $12,500 on December 16, 2015.  In connection with the debt sale, on December 11, 2015, Tucker provided "sample media" to FSD, which FSD in turn provided to Porania.  The sample media, approximately ten loan origination notes, like the debt, was fictional.  On all notes, the lender was represented to be Castle Peak, the loan amount was $300, the financing charge was $90, and the customer signatures were forged.

Through FSD, Porania bought Tucker's false debt portfolios, and sold some to Atlas Acquisitions LLC, another bankruptcy purchaser, in December 2015.  When Porania and Atlas bought the debt, they filed claims in over a thousand pending bankruptcy cases throughout the country, including in the Western District of Missouri.

5

In early 2016, bankruptcy trustees throughout the country disputed filed claims on the "Castle Peak" payday loans in the amount owing of $390. On January 11, 2016, Brooks, as FSD, forwarded an email he had received to Tucker which stated, "Jeff – can you please mark this as "urgent". We have several Trustees inquiring about these accounts." Brooks added to the forwarded email, addressing Tucker, "You have the other media requests as well correct?" Also on January 11, 2016, Tucker responded to Brooks, "I am trying my best to get them."

On February 5, 2016, the Honorable Marvin Isgur, a United States Bankruptcy Judge in Houston, Texas, the Southern District of Texas, opened a Miscellaneous Case, No. 16-302, to investigate the source of over a thousand proofs of $390 "Castle Peak" claims filed in bankruptcy courts across the United States, specifically referencing 26 claims pending in the Southern District of Texas.

Judge Isgur found that Tucker or an entity controlled by him transferred the $390 claims to debt collectors. On March 3, 2016, Judge Isgur ordered Tucker to appear as a witness in the bankruptcy court on March 21, 2016, and to produce documents regarding the filing of proofs of claim.

On March 19, 2016, Tucker received an email from a colleague referring to the 26 claims in Judge Isgur's order, which stated, "Attached is the new spreadsheet of the 18 SSN's and the information found in the eData tables. If they were found in the iCollect table, that information is also exported. You will see duplicate customers but in different funding companies. Many were not funded and were either withdrawn or denied but I pulled all the app data for them."

Tucker appeared before Judge Isgur in Houston on April 4, 2016, but produced no documents. Tucker testified, "it's taking me more time to go back and go through all those pieces of documentation and also find the media attached with those files." Judge Isgur ordered Tucker taken into custody, but Tucker claimed he could only produce the documents by travelling to Kansas City and Colorado. Judge Isgur released Tucker on the condition he produce the ordered documents and that Tucker notify the trustee and parties before accessing any documents in Kansas City or Colorado.

Tucker violated Judge Isgur's order in that he accessed and caused to be accessed, documents in Kansas City, Missouri, without giving notice to the trustee or parties. Specifically, on April 9, 2016, Tucker caused another person to access a spreadsheet called "icollectmasterfull.xlsx" which was then downloaded to Tucker's virtual server. Further, on April 11, 2016, Tucker caused another person to access spreadsheets "File1_JT.xlsx," "File2_JT.xlsx," "File3_JT.xlsx," "File4_JT.xlsx." These spreadsheets all related to the bankruptcy debt Tucker sold to FSD.

In Kansas City, Missouri, Tucker caused to be created a spreadsheet responsive to Judge Isgur's order that he provide loan documentation for 26 debtors in the Southern District of Texas. On April 28, 2016, Tucker presented to the court a spreadsheet labeled "Tucker027983" which contained false information, including a loan amount of $300 for all debtors, a total balance

6

due of $390 for all debtors, and the lender, which he listed as "Castle Peak" for two debtors. On March 24, 2016, Tucker had received an email from a colleague informing him that at least 8 of the 26 debtors had no loan information. Tucker nevertheless presented to the court loan information on the spreadsheet as though all 26 debtors had received loans and defaulted.

At the hearing on April 28, 2016, Tucker testified before Judge Isgur. Some of his false statements, identified by transcript page number, include:

a.      Q: "Where did these (sample loan documents) come from?" Tucker: "These are generated through the loan management software system Judge." Q: "That who owns?" Tucker: "That I do." Page 80.

b.      Tucker: "Castle Peak was a client of ours and we knew that that loan note was the one they used, yeah." Page 81.

c.      Q: "So you thought all of these people had borrowed $300 from Castle Peak?" Tucker: "Right." Page 83.

d.      Q: "So, Mr. Tucker, when did you reclaim ownership of the 2,000,000 debt files or claims?" Tucker: "April of - - April 5th of 2014." Page 109.

e.      Tucker: "I mean I believe Castle Peak was one of the issuers." Pages 116-17.

f.      Tucker: "Yeah, Castle Peak was one - - the issuer. Yes, one of the issuers, yes." Page 140.

g.      Q: "At the time that First Source sold the claims that you transferred to First Source to Porania, you thought that Castle Peak was the sole issuer of those claims; is that correct?" Tucker: "One of the issuers, yes. The sole issuer, yes." Page 142.

h.      Q: "why did you email Mr. Brooks with the Castle Peak information?" Tucker: "Well, that was one of the lenders. That's a lender." Page 166.

After the April 28 hearing, Judge Isgur found that Tucker gave "incredible testimony" and ordered that a forensic computer examiner be appointed to obtain computers and files showing the originating lenders of the $390 claims, and to obtain Tucker's communications, in addition to completing other tasks.

On June 29, 2016, Judge Isgur ordered Tucker to file with the court a declaration as to how he prepared the document "Tucker027983". On July 8, 2016, Tucker filed a sworn declaration with the Bankruptcy Court listing the steps he took to personally prepare the spreadsheet in Kansas City, Missouri. The declaration was false, in that Tucker had another person prepare the spreadsheet and some of the information on the spreadsheet was not obtained from data in his files or electronic documents as he stated in the declaration, but was fictional.

Tucker testified before Judge Isgur again at a hearing October 11, 2016.

Q: "Do you have an understanding of why Castle Peak is identified as the issuer of those loans?" Tucker: "Yeah, that was the mask - - the masked name for the file that was sent over." Q: "What did Castle Peak do?" Tucker: "Castle Peak was a - - was a processing - - part of our processing - - I mean, more of the call center management business." Page 101.

Tucker also testified at the October 11, 2016, hearing that: no documents or authority provided him with ownership of the payday loans he sold; the $390 loan amounts were not based

7

on facts; and he had no method of determining whether he sold loans multiple times.

### COUNT ONE

On or about September 19, 2014, in the Western District of Missouri and elsewhere, as a result of the scheme to sell fake debt, defendant Joel Jerome Tucker caused to be transferred in interstate commerce between KSQ Bank of the West acct. no. 2331 and Commerce Bank in Kansas City, Missouri, $5,000, knowing at the time that the same had been obtained and taken by fraud, that is, money paid to purchase falsified debt portfolios which Tucker did not own, which purchases were made in reliance on the false and fraudulent material representations and omissions by defendant as set forth above, the factual allegations of which are incorporated by reference as if fully set forth herein, and from which proceeds funds were disbursed.

### COUNT FOURTEEN

Between on or about February 5, 2016, through on or about October 11, 2016, in the Western District of Missouri and elsewhere, Joel Jerome Tucker, with the intent to defraud and having devised or intending to devise a scheme or artifice to defraud and for the purpose of executing or concealing such scheme or artifice, made material false statements to, and violated court orders of, the United States Bankruptcy Court in the Southern District of Texas in miscellaneous case number 16-302, as detailed above.

### COUNT SIXTEEN

From on or about May 6, 2014, to on or about the date of this superseding indictment, in the Western District of Missouri and elsewhere, Joel Jerome Tucker, did willfully attempt to evade and defeat income tax due and owing by him to the United States of America for the calendar years 2007-2008, by:  1) in August 2016, telling an IRS revenue agent that he had no income and was living on borrowed funds; 2) submitting a false Form 433-A on August 31, 2016, by materially omitting an asset, which was his membership in the Vail Mountain Club for which he received $275,000 on September 26, 2016; 3) in July 2017, telling an IRS revenue agent that he had no income and was borrowing a lot of money from his mother;  4) failing to make payments for taxes owed the IRS with money he had available from May 2014 through 2017; 5) using nominee bank accounts to conceal income and assets; 6) spending hundreds of thousands of dollars in personal living expenses such as vehicles, chartered jets, travel and entertainment, and a personal residence; and 7) by concealing and attempting to conceal from all proper officers of the United States of America his true financial condition.

The defendant admits that $5,000 for the forfeiture allegation was derived from proceeds he obtained from Count One.  The defendant agrees to pay $8,057,079.95 in restitution as due and owing the United States, and agrees to waive the time period to being enforcement on behalf of the IRS.

**4. Use of Factual Admissions and Relevant Conduct.**  The defendant acknowledges,

understands and agrees that the admissions contained in Paragraph 3 and other portions of this plea

agreement will be used for the purpose of determining his guilt and advisory sentencing range under the United States Sentencing Guidelines ("U.S.S.G."), including the calculation of the defendant's offense level in accordance with U.S.S.G. § 1B1.3(a)(2). The defendant acknowledges, understands and agrees that the conduct charged in any dismissed counts of the superseding indictment as well as all other uncharged related criminal activity may be considered as "relevant conduct" pursuant to U.S.S.G. § 1B1.3(a)(2) in calculating the offense level for the charges to which he is pleading guilty.

**5.   Statutory Penalties.**  The defendant understands that upon his plea of guilty to Count One of the Superseding Indictment charging him with Interstate Transportation of Stolen Property, the maximum penalty the Court may impose is not more than ten years of imprisonment, a $250,000 fine, three years of supervised release, and an order of restitution. This offense is a Class C felony. Upon his plea of guilty to Count Fourteen of the Superseding Indictment charging him with Bankruptcy Fraud, the maximum penalty the Court may impose is not more than five years of imprisonment, a $250,000 fine, and three years of supervised release. This offense is a Class D felony. Upon his plea of guilty to Count Sixteen of the Superseding Indictment charging him with Tax Evasion, the maximum penalty the Court may impose is not more than five years of imprisonment, a $100,000 fine, and three years of supervised release. This offense is a Class D felony. A $100 mandatory special assessment per felony count of conviction must be paid in full at the time of sentencing.

**6.   Sentencing Procedures.**  The defendant acknowledges, understands and agrees to the following:

      a.  in determining the appropriate sentence, the Court will consult and consider the United States Sentencing Guidelines promulgated by the United States Sentencing Commission; these Guidelines, however, are advisory in nature, and the

9

Court may impose a sentence either less than or greater than the defendant's applicable Guidelines range, unless the sentence imposed is "unreasonable";

    b.  the Court will determine the defendant's applicable Sentencing Guidelines range at the time of sentencing;

    c. in addition to a sentence of imprisonment, the Court may impose a term of supervised release of up three years; that the Court must impose a period of supervised release if a sentence of imprisonment of more than one year is imposed;

    d. if the defendant violates a condition of his supervised release, the Court may revoke his supervised release and impose an additional period of imprisonment of up to two years without credit for time previously spent on supervised release.  In addition to a new term of imprisonment, the Court also may impose a new period of supervised release, the length of which cannot exceed three years, less the term of imprisonment imposed upon revocation of the defendant's first supervised release;

    e. the Court may impose any sentence authorized by law, including a sentence that is outside of, or departs from, the applicable Sentencing Guidelines range;

    f. any sentence of imprisonment imposed by the Court will not allow for parole;

    g. the Court is not bound by any recommendation regarding the sentence to be imposed or by any calculation or estimation of the Sentencing Guidelines range offered by the parties or the United States Probation Office; and

    h. the defendant may not withdraw his guilty plea solely because of the nature or length of the sentence imposed by the Court.

    i. The defendant agrees that the United States may institute civil, judicial or administrative forfeiture proceedings against all forfeitable assets in which the defendant has an interest, and that he will not contest any such forfeiture proceedings.

    j. The defendant agrees to forfeit all interests he owns or over which he exercises control, directly or indirectly, in any asset that is subject to forfeiture to the United States either directly or as a substitute for property that was subject to forfeiture but is no longer available for the reasons set forth in 21 U.S.C. § 853(p) (which is applicable to this action pursuant to 18 U.S.C. §§ 981(a)(1)(C) and 982(a)(2)(A).  With respect to any asset which the defendant has agreed to forfeit, the defendant waives any constitutional and statutory challenges in any manner (including direct appeal, habeas corpus, or any other means) to any forfeiture

10

carried out in accordance with this plea agreement on any grounds, including that the forfeiture constitutes an excessive fine or punishment under the Eighth Amendment to the United States Constitution.

k. The defendant agrees to fully and truthfully disclose the existence, nature and location of all assets forfeitable to the United States, either directly or as a substitute asset, in which he had any direct or indirect financial interest, or exercise or exercised control, directly or indirectly, during the period from 2014 to the present. The defendant also agrees to fully and completely assist the United States in the recovery and forfeiture of all such forfeitable assets.

l. The defendant agrees to take all necessary steps to comply with the forfeiture matters set forth herein before his sentencing.

m. Within 10 days of the execution of this plea agreement, at the request of the USAO, the defendant agrees to execute and submit  (1) a Tax Information Authorization form; (2) an Authorization to Release Information; (3) a completed financial disclosure statement; and (4) copies of financial information that the defendant submits to the U.S. Probation Office. The defendant understands that the United States will use the financial information when making its recommendation to the Court regarding the defendant's acceptance of responsibility.

**7. Government's Agreements.** Based upon evidence in its possession at this time, the United States Attorney's Office for the Western District of Missouri, as part of this plea agreement, agrees not to bring any additional charges against defendant for any federal criminal offenses related to the superseding indictment for which it has venue and which arose out of the defendant's conduct described above. Additionally, the United States Attorney for the Western District of Missouri agrees to dismiss Counts Two – Thirteen and Fifteen of the Superseding Indictment at sentencing.

The defendant understands that this plea agreement does not foreclose any prosecution for an act of murder or attempted murder, an act or attempted act of physical or sexual violence against the person of another, or a conspiracy to commit any such acts of violence or any criminal activity of which the United States Attorney for the Western District of Missouri has no knowledge.

The defendant recognizes that the United States' agreement to forego prosecution of all of the criminal offenses with which the defendant might be charged is based solely on the promises made by the defendant in this agreement. If the defendant breaches this plea agreement, the United States retains the right to proceed with the original charges and any other criminal violations established by the evidence. The defendant expressly waives his right to challenge the initiation of the dismissed or additional charges against him if he breaches this agreement. The defendant expressly waives his right to assert a statute of limitations defense if the dismissed or additional charges are initiated against him following a breach of this agreement. The defendant further understands and agrees that if the Government elects to file additional charges against him following his breach of this plea agreement, he will not be allowed to withdraw his guilty plea.

**8.  Preparation of Presentence Report.**  The defendant understands the United States will provide to the Court and the United States Probation Office a government version of the offense conduct. This may include information concerning the background, character, and conduct of the defendant, including the entirety of his criminal activities. The defendant understands these disclosures are not limited to the counts to which he has pleaded guilty. The United States may respond to comments made or positions taken by the defendant or the defendant's counsel and to correct any misstatements or inaccuracies. The United States further reserves its right to make any recommendations it deems appropriate regarding the disposition of this case, subject only to any limitations set forth in this plea agreement. The United States and the defendant expressly reserve the right to speak to the Court at the time of sentencing pursuant to Rule 32(i)(4) of the Federal Rules of Criminal Procedure.

**9.   Withdrawal of Plea.**  Either party reserves the right to withdraw from this plea agreement for any or no reason at any time prior to the entry of the defendant's plea of guilty and

12

its formal acceptance by the Court.  In the event of such withdrawal, the parties will be restored to their pre-plea agreement positions to the fullest extent possible.  However, after the plea has been formally accepted by the Court, the defendant may withdraw his pleas of guilty only if the Court rejects the plea agreement or if the defendant can show a fair and just reason for requesting the withdrawal.  The defendant understands that if the Court accepts his plea of guilty and this plea agreement but subsequently imposes a sentence that is outside the defendant's applicable Sentencing Guidelines range, or imposes a sentence that the defendant does not expect, like or agree with, he will not be permitted to withdraw his plea of guilty.

10.  **Agreed Guidelines Applications.**  With respect to the application of the Sentencing Guidelines to this case, the parties stipulate and agree as follows:

a.  The Sentencing Guidelines do not bind the Court and are advisory in nature.  The Court may impose a sentence that is either above or below the defendant's applicable Guidelines range, provided the sentence imposed is not "unreasonable";

b.  The parties may argue the offense level for Counts One and Fourteen and any applicable enhancements or reductions.  The United States will argue that the offense level for Counts One and Fourteen is 32 based upon a loss of $3.5 - $9.5 million, plus a two-level enhancement for number of victims pursuant to § 2B1.1(9), plus a two-level enhancement for misrepresentation in bankruptcy applies pursuant to § 2B1.1(9), plus a two-level enhancement for sophisticated means applies pursuant to § 2B1.1(10), plus a two-level enhancement for role in the offense pursuant to § 3B1.1(c);

c.  The parties may argue the offense level for Count Sixteen and any applicable enhancements or reductions.  The United States will argue the offense level for Count Sixteen is 28 based upon a tax loss of $8,057,079.95 pursuant to § 2T1.1, plus a two-level enhancement for income from criminal activity pursuant to § 2T1.1(b)(1); plus a two-level enhancement for sophisticated means pursuant to § 2T1.1(b)(2);

d.  Either party may request a departure or variance from the advisory Sentencing Guidelines range;

13

e.  The defendant has admitted his guilt and clearly accepted responsibility for his actions, and has assisted authorities in the investigation or prosecution of his own misconduct by timely notifying authorities of his intention to enter a plea of guilty, thereby permitting the Government to avoid preparing for trial and permitting the Government and the Court to allocate their resources efficiently. Therefore, he is entitled to a three-level reduction pursuant to § 3E1.1(b) of the Sentencing Guidelines, unless the defendant (1) fails to abide by all of the terms and conditions of this plea agreement and his pretrial release; or (2) attempts to withdraw his guilty pleas, violates the law, or otherwise engages in conduct inconsistent with his acceptance of responsibility;

f.  The parties agree that the Court will determine his applicable criminal history category after receipt of the presentence investigation report prepared by the United States Probation Office;

g.  The defendant understands that the estimate of the parties with respect to the Guidelines computation set forth in the subsections of this paragraph does not bind the Court or the United States Probation Office with respect to the appropriate Guidelines levels. Additionally, the failure of the Court to accept these stipulations will not, as outlined in Paragraph 9 of this plea agreement, provide the defendant with a basis to withdraw his plea of guilty;

h.  The defendant consents to judicial fact-finding by a preponderance of the evidence for all issues pertaining to the determination of the defendant's sentence, including the determination of any mandatory minimum sentence (including the facts that support any specific offense characteristic or other enhancement or adjustment), and any legally authorized increase above the normal statutory maximum. The defendant waives any right to a jury determination beyond a reasonable doubt of all facts used to determine and enhance the sentence imposed, and waives any right to have those facts alleged in the superseding indictment. The defendant also agrees that the Court, in finding the facts relevant to the imposition of sentence, may consider any reliable information, including hearsay;

i.  The defendant understands and agrees that the factual admissions contained in Paragraph 3 of this plea agreement, and any admissions that he will make during his plea colloquy, support the imposition of the agreed-upon Guidelines calculations contained in this agreement;

j.  The United States agrees that defendant may remain on bond pending sentencing assuming he is in compliance with the terms of pre-trial supervision.

**11.  Effect of Non-Agreement on Guidelines Applications.** The parties understand, acknowledge and agree that there are no agreements between the parties with respect to any

14

Sentencing Guidelines issues other than those specifically listed in Paragraph 10, and its subsections. As to any other Guidelines issues, the parties are free to advocate their respective positions at the sentencing hearing.

12. **Change in Guidelines Prior to Sentencing.** The defendant agrees that if any applicable provision of the Guidelines changes after the execution of this plea agreement, then any request by defendant to be sentenced pursuant to the new Guidelines will make this plea agreement voidable by the United States at its option. If the Government exercises its option to void the plea agreement, the United States may charge, reinstate, or otherwise pursue any and all criminal charges that could have been brought but for this plea agreement.

13. **Government's Reservation of Rights.** The defendant understands that the United States expressly reserves the right in this case to:

     a. oppose or take issue with any position advanced by defendant at the sentencing hearing which might be inconsistent with the provisions of this plea agreement;

     b. comment on the evidence supporting the charges in the superseding indictment;

     c. oppose any arguments and requests for relief the defendant might advance on an appeal from the sentences imposed and that the United States remains free on appeal or collateral proceedings to defend the legality and propriety of the sentence actually imposed, even if the Court chooses not to follow any recommendation made by the United States; and

     d. oppose any post-conviction motions for reduction of sentence, or other relief.

14. **Waiver of Constitutional Rights.** The defendant, by pleading guilty, acknowledges that he has been advised of, understands, and knowingly and voluntarily waives the following rights:

     a. the right to plead not guilty and to persist in a plea of not guilty;

b.   the right to be presumed innocent until his guilt has been established beyond a reasonable doubt at trial;

c.   the right to a jury trial, and at that trial, the right to the effective assistance of counsel;

d.   the right to confront and cross-examine the witnesses who testify against him;

e.   the right to compel or subpoena witnesses to appear on his behalf; and

f.   the right to remain silent at trial, in which case his silence may not be used against him.

The defendant understands that by pleading guilty, he waives or gives up those rights and that there will be no trial.  The defendant further understands that if he pleads guilty, the Court may ask him questions about the offense or offenses to which he pleaded guilty, and if the defendant answers those questions under oath and in the presence of counsel, his answers may later be used against him in a prosecution for perjury or making a false statement.  The defendant also understands he has pleaded guilty to a felony offense and, as a result, will lose his right to possess a firearm or ammunition and might be deprived of other rights, such as the right to vote or register to vote, hold public office, or serve on a jury.

### 15.  **Waiver of Appellate and Post-Conviction Rights**.

a.   The defendant acknowledges, understands and agrees that by pleading guilty pursuant to this plea agreement he waives his right to appeal or collaterally attack a finding of guilt following the acceptance of this plea agreement, except on grounds of (1) ineffective assistance of counsel; or (2) prosecutorial misconduct.

b.   The defendant expressly waives his right to appeal his sentence, directly or collaterally, on any ground except claims of (1) ineffective assistance of counsel; (2) prosecutorial misconduct; or (3) an illegal sentence.  An "illegal sentence" includes a sentence imposed in excess of the statutory maximum, but does *not* include less serious sentencing errors, such as a misapplication of the Sentencing Guidelines, an abuse of discretion, or the imposition of an unreasonable sentence.  However, if the United States exercises its right to appeal the sentence imposed as

16

authorized by 18 U.S.C. § 3742(b), the defendant is released from this waiver and may, as part of the Government's appeal, cross-appeal his sentence as authorized by 18 U.S.C. § 3742(a) with respect to any issues that have not been stipulated to or agreed upon in this agreement.

16. **Financial Obligations.**  By entering into this plea agreement, the defendant represents

that he understands and agrees to the following financial obligations:

a.  The Court may order restitution.  The parties agree that the Court will order restitution to the Internal Revenue Service in the total amount of $8,057,079.95, pursuant to 18 U.S.C. 3663(a)(3).  Defendant understands and agrees that this figure does not include all interest under 26 U.S.C. § 6601, which will be assessed by the IRS pursuant to Title 26.

b.  Defendant agrees that restitution is due and payable immediately after the judgment is entered and is subject to immediate enforcement, in full, by the United States.  If the Court imposes a schedule of payments, Defendant agrees that the schedule of payments is a schedule of the minimum payment due, and that the payment schedule does not prohibit or limit the methods by which the United States may immediately enforce the judgment in full.

c.  The IRS will use the amount of restitution ordered as the basis for a civil assessment under 26 U.S.C. § 6201(a)(4).  Defendant does not have the right to challenge the amount of this restitution-based assessment.  *See* 26 U.S.C. § 6201(a)(4)(C).  Neither the existence of a restitution payment schedule nor Defendant's timely payment of restitution according to that schedule will preclude the IRS from immediately collecting the full amount of the restitution-based assessment.  Interest on the restitution-based assessment will accrue under 26 U.S.C. § 6601 from the last date prescribed for payment of the tax liability that is the subject of the restitution-based assessment to the date that the IRS receives full payment.

d.  Defendant is entitled to receive credit for restitution paid pursuant to this plea agreement against those assessed civil tax liabilities due and owing for the same periods for which restitution was ordered.  Defendant understands and agrees that the plea agreement does not resolve the Defendant's civil tax liabilities; that the IRS may seek additional taxes, interest, and penalties from Defendant relating to the conduct covered by this plea agreement and for conduct relating to another time period, and that satisfaction of the restitution debt does not settle, satisfy, or compromise Defendant's obligation to pay any remaining civil tax liability. Defendant authorizes release of information to the IRS for purposes of making the civil tax and restitution-based assessments.

17

e.  Defendant understands that he is not entitled to credit with the IRS for any payment until the payment is received by the IRS.

f.  If full payment cannot be made immediately, Defendant agrees to make a complete and accurate financial disclosure to the IRS on forms prescribed by the IRS (including, but not limited to, IRS Form 433-A and Form 433-B, as appropriate), and to disclose to the IRS any and all additional financial information and financial statements provided to the probation office.  Defendant also agrees to provide the above-described information to the probation office.

g.  If Defendant makes a payment of the restitution prior to sentencing, the payment will be applied as a credit against the restitution ordered.

h.  The United States may use the Federal Debt Collection Procedures Act and any other remedies provided by law to enforce any restitution order that may be entered as part of the sentence in this case and to collect any fine.

i.  With each payment to the Clerk of the Court made pursuant to the District Court's restitution order, defendant will provide the following information:

1.  Defendant's name and Social Security number;
2.  The District Court docket number assigned to this case;
3.  Tax year(s) or period(s) for which restitution has been ordered; and
4.  A statement that the payment is being submitted pursuant to the District Court's restitution order.

The Clerk of the Court should send the information along with the payments, to:

IRS – RACS
Attn:  Mail Stop 6261, Restitution
333 W. Pershing Ave.
Kansas City, MO 64108

j.  The defendant hereby authorizes the USAO to obtain a credit report pertaining to him to assist the USAO in evaluating the defendant's ability to satisfy any financial obligations imposed as part of the sentence.

k.  The defendant understands that a Special Assessment will be imposed as part of the sentence in this case.  The defendant promises to pay the Special Assessment of $300 by submitting a satisfactory form of payment to the Clerk of the Court prior to appearing for the sentencing proceeding in this case.  The defendant agrees to provide the Clerk's receipt as evidence of his fulfillment of this obligation at the time of sentencing.

l.  The defendant certifies that he has made no transfer of assets or property for the purpose of (1) evading financial obligations created by this Agreement; (2)

18

evading obligations that may be imposed by the Court; nor (3) hindering efforts of the USAO to enforce such financial obligations.  Moreover, the defendant promises that he will make no such transfers in the future.

  m.  In the event the United States learns of any misrepresentation in the financial disclosure statement, or of any asset in which the defendant had an interest at the time of this plea agreement that is not disclosed in the financial disclosure statement, and in the event such misrepresentation or nondisclosure changes the estimated net worth of the defendant by ten thousand dollars or more, the United States may at its option: (1) choose to be relieved of its obligations under this plea agreement; or (2) let the plea agreement stand, collect the full forfeiture, restitution, and fines imposed by any criminal or civil judgment, and also collect 100% of the value of any previously undisclosed assets.  The defendant agrees not to contest any collection of such assets.  In the event the United States opts to be relieved of its obligations under this plea agreement, the defendant's previously entered pleas of guilty shall remain in effect and cannot be withdrawn.

**17.  Waiver of FOIA Request.**  The defendant waives all of his rights, whether asserted directly or by a representative, to request or receive, or to authorize any third party to request or receive, from any department of the United States any records pertaining to the investigation or prosecution of this case including, without limitation, any records that may be sought under the Freedom of Information Act, 5 U.S.C. § 552, or the Privacy Act of 1974, 5 U.S.C. § 552a.

**18.  Waiver of Claim for Attorney's Fees.**  The defendant waives all of his claims under the Hyde Amendment, 18 U.S.C. § 3006A, for attorney's fees and other litigation expenses arising out of the investigation or prosecution of this matter.

**19.  Defendant's Breach of Plea Agreement.**  If the defendant commits any crimes, violates any conditions of release, or violates any term of this plea agreement between the signing of this plea agreement and the date of sentencing, or fails to appear for sentencing, or if the defendant provides information to the Probation Office or the Court that is intentionally misleading, incomplete, or untruthful, or otherwise breaches this plea agreement, the United States will be released from its obligations under this agreement.  The defendant, however, will remain

19

bound by the terms of the agreement, and will not be allowed to withdraw his plea of guilty.

The defendant also understands and agrees that in the event he violates this plea agreement, all statements made by him to law enforcement agents subsequent to the execution of this plea agreement, any testimony given by him before a grand jury or any tribunal or any leads from such statements or testimony shall be admissible against him in any and all criminal proceedings. The defendant waives any rights that he might assert under the United States Constitution, any statute, Rule 11(f) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal rule that pertains to the admissibility of any statements made by him subsequent to this plea agreement.

20. **Defendant's Representations.**  The defendant acknowledges that he has entered into this plea agreement freely and voluntarily after receiving the effective assistance, advice and approval of counsel.  The defendant acknowledges that he is satisfied with the assistance of counsel, and that counsel has fully advised him of his rights and obligations in connection with this plea agreement.  The defendant further acknowledges that no threats or promises, other than the promises contained in this plea agreement, have been made by the United States, the Court, his attorneys or any other party to induce him to enter his plea of guilty.

21. **No Undisclosed Terms.**  The United States and defendant acknowledge and agree that the above-stated terms and conditions, together with any written supplemental agreement that might be presented to the Court in camera, constitute the entire plea agreement between the parties, and that any other terms and conditions not expressly set forth in this agreement or any written supplemental agreement do not constitute any part of the parties' agreement and will not be enforceable against either party.

22. **Standard of Interpretation.**  The parties agree that, unless the constitutional

20

implications inherent in plea agreements require otherwise, this plea agreement should be interpreted according to general contract principles and the words employed are to be given their normal and ordinary meanings.  The parties further agree that, in interpreting this agreement, any drafting errors or ambiguities are not to be automatically construed against either party, whether or not that party was involved in drafting or modifying this agreement.

Timothy A. Garrison
United States Attorney

Dated: _7/16/20_        _Kathl D. 1_
Kathleen D. Mahoney
Assistant United States Attorney

I have consulted with my attorneys and fully understand all of my rights with respect to the offenses charged in the superseding indictment.  Further, I have consulted with my attorneys and fully understand my rights with respect to the provisions of the Sentencing Guidelines.  I have read this plea agreement and carefully reviewed every part of it with my attorneys.  I understand this plea agreement and I voluntarily agree to it.

Dated: _7/14/20_        _____
Joel Tucker
Defendant

We are defendant Joel Tucker's attorneys.  We have fully explained to him his rights with respect to the offenses charged in the superseding indictment.  Further, we have reviewed with him the provisions of the Sentencing Guidelines which might apply in this case.  We have carefully reviewed every part of this plea agreement with him.  To our knowledge, Joel Tucker's decision to enter into this plea agreement is an informed and voluntary one.

Dated: _7/16/20_        _____
J.R. Hobbs
Attorney for Defendant

Dated: _7/16/20_        _____
Marilyn Keller
Attorney for Defendant

21